**Maria V. ALTMANN, an individual, Plaintiff–Appellee,**

v.

**REPUBLIC OF AUSTRIA, a foreign state; and the Austrian Gallery, an agency of the Republic of Austria, Defendants–Appellants.**

Nos. 01–56003, 01–56398.

United States Court of Appeals, Ninth Circuit.

Argued March 7, 2002.

Submitted May 24, 2002.

Decided Dec. 12, 2002.

958

Scott P. Cooper, Jonathan E. Rich, Tanya L. Forsheit, Proskauer Rose LLP, Los Angeles, CA, for the appellants.

E. Randol Schoenberg, Los Angeles, CA, for the appellee.

David A. Lash, Bet Tzedek Legal Services, Los Angeles, CA; Margot A. Metzner, Janie F. Schulman, Sheila Recio, Michael J. Bostrom, Morrison & Foerster LLP, Los Angeles, CA, for the amicus.

Before: WARDLAW, W. FLETCHER, Circuit Judges and WHYTE,* District Judge.

WARDLAW, Circuit Judge.

At issue is whether the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, confers jurisdiction in the United States District Court for the Central District of California over the Republic of Austria and the state-owned Austrian Gallery in a suit alleging wrongful appropriation of six Gustav Klimt paintings from their rightful heirs. Maria Altmann, a United States citizen, seeks the recovery of the paintings from the Republic of Austria, which now houses them in the Austrian Gallery. She alleges that (i) the Nazis took the paintings from her Jewish uncle to "Aryanize" them in violation of international law; (ii) the pre-World War II and wartime Austrian government was complicit in their original takings; (iii) the current government, when it learned of the heirs' rights to the paintings, deceived the heirs as to the circumstances of its acquisition of the paintings; and (iv) the Republic and the Gallery now wrongfully assert ownership over the paintings. The Republic of Austria appeals from the district court's denial of its motion to dismiss for want of jurisdiction. Rejecting the Austrian Republic's assertions, the district court found, *inter alia*, that the FSIA applied retroactively and generally to the events of the late 1930s and 1940s, and that the seizure of the paintings fell within the expropriation exception to the FSIA's grant of immunity.

For the reasons stated below, we determine that the exercise of jurisdiction in this case does not work an impermissible retroactive application of the FSIA. If true, the facts alleged by Altmann establish a taking in violation of international law that confers jurisdiction upon our federal courts, and thus Altmann has presented a substantial and nonfrivolous claim. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 711 (9th Cir.1992) ("At the jurisdictional stage, we need not decide whether the taking actually violated international law; as long as a 'claim is substantial and nonfrivolous, it provides a sufficient basis for the exercise of our jur-

* The Honorable Ronald M. Whyte, United States District Judge for the Northern District of California, sitting by designation.

isdiction.'" (quoting *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 826 (9th Cir.1987))), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). Because Appellants profit from the Klimt paintings in the United States, by authoring, promoting, and distributing books and other publications exploiting these very paintings, these actions are sufficient to constitute "commercial activity" for the purpose of satisfying the FSIA, as well as the predicates for personal jurisdiction. Finally, because the Republic of Austria "does business" in the Central District of California, venue is appropriate there and the principles of *forum non conveniens* do not counsel otherwise. Thus we uphold the district court's assertion of jurisdiction under the FSIA.

## I. Background

In the early 1900s Ferdinand Bloch, a wealthy Czech sugar magnate, commissioned a portrait of his young wife, Adele Bloch–Bauer, by the Austrian painter Gustav Klimt. Adele and Ferdinand, members of the wealthy Viennese intellectual elite, commissioned Klimt's painting at a time when the artist commanded a fee in excess of a quarter of the price of a furnished country villa. Klimt made hundreds of sketches of Adele, culminating in 1907 with the shimmery golden portrait, *Adele Bloch–Bauer I*. Before Adele's untimely passing in 1925, she owned six Klimt paintings, including another portrait of herself, a portrait of a close friend, and three landscapes: *Adele Bloch–Bauer I & II, Amalie Zuckerkandl, Apple Tree I, Beechwood,* and *Houses in Unterach am Attersee.* Obviously oblivious to the terror to come, which would dramatically affect Austria generally and her husband Ferdinand intimately, Adele left a will "kindly" requesting that Ferdinand donate the paintings to the Austrian Gallery upon his death.

The Nazi invasion of Austria on March 12, 1938, worked a dramatic upheaval on the lives of Ferdinand and all Austrians. Many of the Austrians embraced the Nazis, moving Adolf Hitler to declare the *Anschluss*—the annexation of Austria to Nazi Germany—the next day. To imbue these actions with a quasi-legal basis, a mock Council of Ministers was convened, which adopted the resolution for the *Anschluss.* The legitimate Austrian cabinet leaders were arrested and deported to concentration camps. The country was split into single districts under the direct control of Berlin. Even the name "Austria" was abolished. Ferdinand, who was Jewish and had supported anti-Nazi efforts before the annexation of Austria, fled the country to avoid persecution, leaving behind all his holdings, including his paintings, a valuable porcelain collection, and his beautiful home, castle, and sugar factory. He settled in Zurich, Switzerland.

In the meantime, Nazi officials, accompanied by representatives of what later became the Austrian Gallery, convened a meeting to divide up Ferdinand's property. His sugar company was "Aryanized" and his Vienna home was reduced to a German railway headquarters. Reinhardt Heydrich, the author of the infamous Final Solution, moved into Ferdinand's castle. Ferdinand's vast porcelain collection was sold at a public auction, with the best pieces going to Vienna's museums. Hitler and Hermann G#37#ring confiscated some of Ferdinand's Austrian Masters paintings for their private collections. Others were bought for Hitler's planned museum at Linz. Dr. Erich Fuerher, the Nazi lawyer liquidating the estate, chose a few paintings for his personal collection. Dr. Fuerher purported to give two of the paintings at issue, *Adele Bloch–Bauer I* and *Apple Tree I,* to the Austrian Gallery in 1941, in exchange for a painting donated by Ferdinand in 1936. He accompanied

the transaction with a note claiming to deliver the paintings in fulfillment of the last will and testament of Adele and signed it "Heil Hitler." In March 1943, Dr. Fuerher sold *Adele Bloch–Bauer II* to the Gallery and *Beechwood* to the Museum of the City of Vienna. He kept *Houses in Unterach am Attersee* for his personal collection. It is not clear what immediately happened to *Amalie Zuckerkandl,* although it ended up in the hands of the art dealer Vita K# 3C# nstler.

Ferdinand died in Switzerland in November 1945. He left a will, revoking all prior wills, and leaving his entire estate to one nephew and two nieces, including Maria Altmann. Like Ferdinand, Altmann and her husband had been forced to flee Austria. When the Nazis invaded Austria, they imprisoned her husband Fritz in the labor camp at Dachau and moved Altmann to a guarded apartment. Her brother-in-law managed to get Fritz released from Dachau, after which they escaped to Holland. Ultimately, they ended up in Hollywood, California, where Altmann became a United States citizen in 1945.

Also in 1945, the Second Republic of Austria was born and the next year, it declared that all transactions motivated by the Nazis were void. Despite this official policy, Altmann and her family members were unsuccessful in recovering the Klimt paintings. Altmann's brother could retrieve only *Houses in Unterach* from the private collection of Dr. Fuehrer. In December 1947, the Museum of the City of Vienna offered to return the painting *Beechwood,* but only in exchange for a refund of the purchase price. This offer was rejected by Ferdinand's heirs. The heirs then unsuccessfully sought return of three of the paintings from the Gallery;

the Gallery refused to transfer the paintings, asserting that they had been bequeathed to it by the terms of Adele's will. Under color of the will, the legal effect of which has yet to be determined,[1] the museum even began to prepare suit for return of the Klimt paintings not yet in its possession. Despite the museum's aggressive stance, a private letter from Dr. Karl Garzarolli dated March 8, 1948, of the Gallery to his Nazi-era predecessor revealed that nothing in the files of the Gallery would document the donation of the paintings to the Gallery. This letter was kept hidden from Ferdinand's heirs.

In 1948, an agent of Austria's Federal Monument Agency contacted Dr. Rinesch, the Austrian lawyer hired by the family, to discuss the artworks in question. He informed Dr. Rinesch that the artworks could not be exported without resolution of their ownership. In a practice later declared illegal by the Austrian government, the Agency informed Dr. Rinesch that it would grant export permits on some of the family's other recovered artworks in exchange for a "donation" of the Klimt paintings. With little hope of otherwise exporting the other artworks, Dr. Rinesch agreed that Ferdinand's heirs would acknowledge the will of Adele Bloch–Bauer and allow the Austrian Gallery to keep the six Klimt paintings mentioned in the will. He justified this decision to Robert Bentley, Altmann's brother, by claiming that Adele's will would be sufficient to give the museum a claim to the six paintings. He executed a document, dated April 12, 1948, acknowledging the agreement and gave *Houses in Unterach* to the Austrian Gallery. As agreed, Dr. Rinesch obtained

1. Altmann contends that under both Austrian and American law, precatory language such as that set forth in Adele's last will and testament kindly asking another to bequeath his property is unenforceable and ineffective to dispose of that property. To be effective, the will must contain a command or order as to the disposition of property.

export permits for almost all of the other recovered artworks.

In early 1998, an international art scandal broke: the City of New York seized two Egon Schiele paintings loaned by Austria to the Museum of Modern Art in New York, claiming that they were stolen by the Nazis. In response to allegations that the Austrian Gallery still possessed looted art, the Austrian Minister for Education and Culture for the first time opened up the Ministry's archives to permit research into the provenance of the national collection. The Austrian government also created a Committee made up of government officials and art historians to advise the Minister for Education and Culture on which artworks should be returned and to whom. The documents that surfaced in 1998 demonstrated that reliance on Adele's will as the source of legal title to the paintings was questionable at best.

Notwithstanding the discovery of the documents undermining the Austrian Gallery's ownership of the paintings, the Committee recommended against returning the six Klimt paintings at issue. Altmann alleges that the Committee vote was predetermined by the Austrian government before the Committee ever discussed the matter. Altmann points to the resignation of one Committee member who abstained from the vote and later stated that she had been ordered by a superior to vote against return of the six paintings.

In September 1999, Altmann decided to file a lawsuit in Austria to overturn the Committee's recommendation regarding the Klimt paintings. To do so, under Austrian law, Altmann was required to pay a filing fee that is a percentage of the recoverable amount. The standard formula used to calculate the court fees is 1.2% of the amount in controversy plus 13,180 Aus-

trian schillings. Because the amount in controversy here is approximately $135 million, Altmann would have been required to pay about $1.6 million to pursue her claim.[2] Altmann applied for legal aid, seeking reduction of the fees, and was granted a partial waiver. Based on the information detailing her assets, the court determined that Altmann and her co-heirs could afford a fee of 2 million schillings, or approximately $135,000. Although Altmann did not appeal the decision, the Republic of Austria appealed on the grounds that Altmann had not declared the value of various art objects worth almost $700,000 that she had recently recovered from the Austrian government. The petition was rejected as untimely. Regardless of the amount paid, in the event that Altmann prevailed in the Austrian civil action, she would be entitled to recover all of the court fees and her attorney's fees as part of the final judgment.

Because of what they viewed as the prohibitive cost of the lawsuit, Altmann and her family abandoned their Austrian complaint. On August 22, 2000, Altmann filed the present action against the Republic of Austria and the Gallery in the Central District of California. The Republic of Austria and the Gallery moved for dismissal under (i) Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction; (ii) Fed. R.Civ.P. 12(b)(3) for lack of venue; (iii) Fed.R.Civ.P. 12(b)(7) for failure to join indispensable parties; and (iv) the doctrine of *forum non conveniens*. The district court denied this motion on May 4, 2001.

## II. Subject Matter Jurisdiction— The Foreign Sovereign Immunities Act

■ On an appeal from the denial of a motion to dismiss, we review the dismissal

---

**2.** The exchange rate used is from the Declaration of Walter Friedrich in Support of the Republic's Motion to Dismiss and equals 14.7 Austrian schillings per U.S. dollar.

de novo, accepting all well-pleaded factual allegations in the complaint as true and making all reasonable inferences in the non-movant's favor. *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001).

■ A foreign state is normally immune from the jurisdiction of federal and state courts in the United States. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The United States Supreme Court has long recognized that "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Id.* The FSIA provides a limited means to obtain jurisdiction over foreign sovereigns and their agencies and instrumentalities and codifies a statutory set of exceptions to foreign sovereign immunity. Those exceptions include actions involving waiver of immunity, commercial activity, rights in property taken in violation of international law, rights in property in the United States, tortious acts occurring in the United States, and actions brought to enforce arbitration agreements with a foreign state. 28 U.S.C. § 1605. Thus a federal court cannot hear claims against sovereign nations, unless the claim falls within one of these enumerated exceptions. *Verlinden*, 461 U.S. at 497, 103 S.Ct. 1962.

Altmann contends that the taking of her family's Klimt paintings by the Austrian government violates international law and falls squarely within the expropriation exception to the FSIA. The district court agreed, finding that (i) the FSIA was retroactive to the pre- and post-war acts of the Nazis and the Austrian government; (ii) personal jurisdiction existed over the Republic and the Gallery; (iii) the doctrine of *forum non conveniens* did not require transfer of jurisdiction to Austria; (iv) all necessary parties had been joined; and (v)

venue was appropriate in the Central District of California. *Altmann v. Republic of Austria*, 142 F.Supp.2d 1187 (C.D.Cal. 2001). We turn first to whether the FSIA applies to Altmann's claims.

## A. The Applicability of the FSIA

■ We must first determine whether the district court properly held that the FSIA may be applied to the alleged wrongful appropriation by the Republic. The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The defendants maintain that jurisdiction is lacking because the FSIA may not be retrospectively applied to conduct pre-dating the Department of State's 1952 issuance of the Tate Letter, while the last taking in this case purportedly occurred in 1948. *See* Letter of Jack B. Tate, Acting Legal Advisor, Department of State, to Acting Attorney General Philip B. Perlman, May 19, 1952 ("1952 Tate Letter"), *reprinted in* 26 Dep't State Bull. 984 (1952) *and in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711–15 app. 2, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). To the extent courts have considered the retroactivity of the FSIA, the consensus appears to be that it would encompass events dating back at least as far as the date of this letter. *See Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26 (2d Cir. 1988); *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir.1986); *Slade v. United States of Mexico*, 617 F.Supp. 351 (D.D.C.1985).

■ We need not reach the broad conclusion of the district court that the FSIA may be generally applied to events predating the 1952 Tate Letter. Instead, we find persuasive the reasoning set forth by

Judge Wald, who resigned in 1999 from the Court of Appeals for the District of Columbia Circuit to serve two years as a judge on the International Criminal Tribunal for the Former Yugoslavia. In her dissenting opinion in *Princz v. Federal Republic of Germany,* Judge Wald agreed with the majority that application of the FSIA to pre–1952 conduct is not impermissibly retroactive, but set forth a narrower rationale for that conclusion. *See* 26 F.3d 1166, 1178–79 (D.C.Cir.1994) (Wald, J., dissenting on other grounds), *cert. denied,* 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995).

█ The "presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *INS v. St. Cyr,* 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)). Although Congress is empowered to enact statutes with retrospective effect, a statute may not be applied retroactively "absent a clear indication from Congress that it intended such a result." *Id.* (noting that cases where the Supreme Court has found truly retroactive effect involved statutory language so clear that it could sustain only one interpretation).

█ A statute does not operate "retrospectively," and thus impermissibly, simply because it applies to conduct antedating the statute's enactment. *Landgraf v. USI Film Prods.,* 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). We "must ask whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70, 114 S.Ct. 1483. "[T]he judgment whether a particular statute acts retroactively should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations."

*St. Cyr,* 533 U.S. at 321, 121 S.Ct. 2271 (internal quotation marks omitted). We must consider "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. "[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective." *Id.* at 269, 114 S.Ct. 1483 (quoting *Soc'y for Propagation of the Gospel v. Wheeler,* 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (No. 13,156)). On the other hand, statutes that confer or oust jurisdiction, or change procedural rules, may be applied in suits arising before their enactment without raising concerns about retroactivity. *Id.* at 274–75, 114 S.Ct. 1483. Because these rules "take[ ] away no substantive right but simply change[ ] the tribunal that is to hear the case," present law governs in such situations. *Id.* at 274, 114 S.Ct. 1483 (quoting *Hallowell v. Commons,* 239 U.S. 506, 508, 36 S.Ct. 202, 60 L.Ed. 409 (1916)).

The *Princz* majority found that Congress's intention for the FSIA to be retroactively applied was manifest in the statute's statement of purpose that "claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." *Princz,* 26 F.3d at 1170 (quoting 28 U.S.C. § 1602). The majority interpreted Congress's use of the word "henceforth" to mean that "the FSIA is to be applied to all cases decided after its enactment, i.e., regardless of when the plaintiff's cause of action accrued." *Id.* The court also pointed out that Congress's deletion of the language in 28 U.S.C. § 1332 providing for diversity jurisdiction over suits by a United States citizen against a foreign govern-

ment would prevent prospective plaintiffs from suing over pre-enactment acts unless the FSIA's replacement section, 28 U.S.C. § 1330, were available. *Id.* at 1170. Further, the *Princz* majority suggested, as the district court found here, that application of the FSIA to the facts at issue effected merely a change of jurisdiction; thus, because the FSIA did not alter liability under the applicable substantive law, its application would not be impermissibly retroactive. *Id.* at 1170–71; *see also Altmann*, 142 F.Supp.2d at 1200.

Other courts have determined not to apply the FSIA to events predating its enactment. *See Carl Marks*, 841 F.2d 26; *Jackson*, 794 F.2d 1490; *Slade*, 617 F.Supp. 351. Nevertheless, in reaching this conclusion, these courts did not rely solely on the lack of a clear expression of congressional intent; otherwise, they would have concluded that the FSIA could not be applied to events predating its 1976 enactment. Instead, they recognized that the FSIA would properly apply to events occurring after the issuance of the 1952 Tate Letter. *See Carl Marks*, 841 F.2d at 27 ("We believe, as did the district court, that only after 1952 was it reasonable for a foreign sovereign to anticipate being sued in the United States courts on commercial transactions." (alterations and quotation marks omitted)); *Jackson*, 794 F.2d at 1497–98 ("We agree that to give the Act retrospective application to pre–1952 events would interfere with antecedent rights of other sovereigns (and also with antecedent principles of law that the United States followed until 1952)."); *Slade*, 617 F.Supp. at 356 ("[T]he Court finds that the FSIA cannot be applied retroactively to this case where all the operative events occurred before 1952."). Although the issuance of the 1952 Tate Letter has been recognized as the moment when "the American position changed and the 'restrictive theory of sovereign immunity' was adopted," for purposes of determining whether Austria could have settled expectations of immunity in a United States court, we note the observation of Judge Re, Chief Judge Emeritus of the Court of International Trade, that it was announced in 1948 that the State Department was reconsidering the policy. Edward D. Re, *Human Rights, Domestic Courts, and Effective Remedies*, 67 St. John's L.Rev. 581, 583–84 (1993).

Assuming, without deciding, that these cases are correct that congressional intent to allow application of the FSIA to pre-enactment facts is not manifest in the statutory language, we turn to the second prong of the *Landgraf* test and examine "whether applying the FSIA would 'impair rights a party possessed when he acted,' " *Princz*, 26 F.3d at 1178 (Wald, J., dissenting on other grounds) (quoting *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483), i.e., whether Austria would have been entitled to immunity for its alleged complicity in the pillaging and retention of treasured paintings from the home of a Jewish alien who was forced to flee for his life.

In determining what rights Austria possessed when it acted, and what were its legitimate expectations, we look to the practice of American courts at that time, which was one of judicial deference "to the case-by-case foreign policy determinations of the executive branch." *Id.* at 1178–79 (citing *Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962). We note that in *Verlinden*, the Supreme Court explained that "[u]ntil 1952, the State Department ordinarily requested immunity in all actions against *friendly* foreign sovereigns." 461 U.S. at 486, 103 S.Ct. 1962 (emphasis added). In 1943, the Supreme Court pronounced that "it is of public importance that the action of the political arm of the Government taken within its appropriate sphere be promptly recognized, and that the delay and inconvenience of a prolonged litigation

be avoided by prompt termination of the proceedings in the district court." *Ex Parte Peru,* 318 U.S. 578, 587, 63 S.Ct. 793, 87 L.Ed. 1014 (1943). Two years later, the Court exercised *in rem* jurisdiction over a Mexican vessel, noting the absence of a certification of immunity by the State Department or other evidence supporting immunity in conformance with the principles accepted by the State Department. *See Republic of Mexico v. Hoffman,* 324 U.S. 30, 34–35, 65 S.Ct. 530, 89 L.Ed. 729 (1945).

Determining whether the FSIA may properly be applied thus turns on the question whether Austria could legitimately expect to receive immunity from the executive branch of the United States for its complicity in and perpetuation of the discriminatory expropriation of the Klimt paintings. Mindful that such seizures explicitly violated both Austria's and Germany's obligations under the Hague Convention (IV) on the Laws and Customs of War on Land, Oct. 18, 1907, 1 Bevans 631, 1907 U.S.T. LEXIS 29 (entered into force Jan. 26, 1910),[3] and that Austria's Second Republic officially repudiated all Nazi transactions in 1946, we hold that Austria could not expect such immunity.

That Austria and the United States were no longer on opposite sides of World War II at the time the Federal Monument Agency attempted to extort valid title to the Klimt paintings does not mean that Austria could reasonably expect the granting of immunity for an act so closely associated with the atrocities of the War. Although the deprivation of private property, while discriminatory and indeed dehumanizing, pales in comparison with the horrors inflicted upon those who, unlike Ferdinand, were unable to escape the slavery, torture, and mass murder of the Nazi con-

centration camps, we are certain that the Austrians could not have had any expectation, much less a settled expectation, that the State Department would have recommended immunity as a matter of "grace and comity" for the wrongful appropriation of Jewish property.

Indeed, the State Department's position on that question is evident in an April 13, 1949 letter from Mr. Tate announcing the State Department's adoption of a policy to remove obstacles to recovery specifically for victims of Nazi expropriations. On April 27, 1949, the United States State Department issued a press release stating, in pertinent part:

As a matter of general interest, the Department publishes herewith a copy of a letter of April 13, 1949 from Jack B. Tate, Acting Legal Advisor, Department of State, to the Attorneys for the plaintiff in Civil Action No. 31–555 in the United States District Court for the Southern District of New York.

The letter repeats this Government's opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls; states that *it is this Government's policy to undo the forced transfers and restitute identifiable property to the victims of Nazi persecution wrongfully deprived of such property;* and sets forth that the policy of the Executive, with respect to claims asserted in the United States for restitution of such property, is *to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.*

Press Release No. 296, "Jurisdiction of United States Courts Re Suits for Identifi-

---

**3.** A number of the treaty's accompanying regulations are directly on point. Article 46 forbids the confiscation of private property, Article 47 forbids pillage, and Article 56 specifically forbids "[a]ll seizure of ... works of art." 1907 U.S.T. LEXIS 29, at *37, *40.

able Property Involved in Nazi Forced Transfers," *reprinted in Bernstein v. N.V. Nederlandsche–Amerikaansche,* 210 F.2d 375, 375–76 (2d Cir.1954) (per curiam) (emphasis added). The press release was accompanied by a copy of the actual letter, which states in pertinent part:

1. This Government has consistently opposed the forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls.

\* \* \*

3. The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property (or compensation in lieu thereof) lost through force, coercion, or duress as a result of Nazi persecution in Germany, is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.

Letter from Jack B. Tate, Acting Legal Advisor, Department of State, to the Attorneys for the plaintiff in Civil Action No. 31–555 (S.D.N.Y.), *reprinted in Bernstein,* 210 F.2d at 376. We conclude, as did Judge Wald, that the application of the FSIA infringes on no right held at the time the acts at issue occurred, and thus the FSIA is not impermissibly applied to Austria in this case.

This result is particularly apt for at least three additional reasons. First, we note that by the 1920s, Austria itself had adopted the restrictive theory, which recognizes sovereign immunity "with regard to sovereign or public acts (*jure imperii* ) of a state, but not with respect to private acts (*jure gestionis* )." 1952 Tate Letter, *reprinted in Alfred Dunhill,* 425 U.S. at 711, 96 S.Ct. 1854; *see also* Joseph M. Sweeney, The International Law of Sovereign Immunity 30 (U.S. Dep't of State Policy Research Study, 1963) ("At the end

of World War I, the courts of Austria abandoned the absolute concept[of sovereign immunity] and adopted the restrictive concept."). As the Tate Letter of May 19 describes:

The newer or restrictive theory of sovereign immunity has always been supported by the courts of Belgium and Italy. It was adopted in turn by the courts of Egypt and of Switzerland. In addition, the courts of France, Austria, and Greece, which were traditionally supporters of the classical theory, reversed their position in the 20's to embrace the restrictive theory. Rumania, Peru, and possibly Denmark also appear to follow this theory.

1952 Tate Letter, *reprinted in Alfred Dunhill,* 425 U.S. at 713, 96 S.Ct. 1854. Thus Austria could have had no reasonable expectation of immunity in a foreign court. As Judge Wald notes, the 1945–46 Nuremberg trials signaled "that the international community, and particularly the United States ... would not have supported a broad enough immunity to shroud the atrocities committed during the Holocaust." *Princz,* 26 F.3d at 1179 (Wald, J., dissenting on other grounds). Because a United States court would apply the international law of takings, which presumably would be applied in any foreign court, the application of the FSIA to the facts of this case "merely address[es] *which* court shall have jurisdiction" and thus "can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties." *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 951, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (emphasis in original) (citing *Landgraf,* 511 U.S. at 275, 114 S.Ct. 1483). Because such application would "affect only *where* a suit may be brought, not *whether* it may be brought at all," *id.* (emphasis in original), the applica-

tion of the FSIA to the facts of this case is not impermissibly retroactive.

Second, the cases holding the FSIA inapplicable to pre–1952 events involve economic transactions entered into long before the facts of this case arose and, unlike here, prior to the defendant country's acceptance of the restrictive principle of sovereign immunity and to the widespread acceptance of the restrictive theory. The Soviet Union, which was sued in *Carl Marks* over its default with respect to ·debt instruments issued in 1916, *see* 841 F.2d at 26, was in 1952, together with the Soviet satellite countries and the United Kingdom, one of the few remaining jurisdictions that supported "continued full acceptance of the absolute theory of sovereign immunity." 1952 Tate Letter, *reprinted in Alfred Dunhill,* 425 U.S. at 715, 96 S.Ct. 1854. The 1952 Tate Letter also noted that China, sued in *Jackson* over its default on bonds issued in 1911, *see* 794 F.2d at 1491, was among the jurisdictions not yet having clearly adopted the restrictive principle. 1952 Tate Letter, *reprinted in Alfred Dunhill,* 425 U.S. at 712, 96 S.Ct. 1854. As for Mexico, sued in *Slade* over its default over a 1922 interest agreement, *see* 617 F.Supp. 351, it is well-known that Latin–American nations did not accept the restrictive approach to immunity well into the 1980s. *See* Wang Houli, *Sovereign Immunity: Chinese Views and Practices,* J. Chinese L., Spring 1987, at 22, 27.

Third, the disputes in *Carl Marks, Jackson,* and *Slade* essentially involved contracts, an area in which courts have traditionally deferred to the "settled expectations" of the parties at the time of contracting in recognition of the parties' allocation of risk. Such deference is especially due in financial transactions involving foreign debt instruments, where unexpected judicial intrusion essentially would re-write the parties' original bargain. Such presumptions are inapplicable in the context of a claim like the international takings violation at issue here. Thus, even if Austria had indeed expected not to be sued in a foreign court at the time it acted, an expectation which we have explained would be patently unreasonable, such expectation would be due no deference.

For these reasons, we hold that application of the FSIA to the pre–1952 actions of the Republic of Austria is not impermissibly retroactive.

**B. Expropriation Exception to Sovereign Immunity**

 The FSIA's expropriation exception to immunity provides that:

A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case ... (3) in which rights in property taken in violation of international law are in issue and ... that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States....

28 U.S.C. § 1605(a). This exception to foreign sovereign immunity "is based upon the general presumption that states abide by international law and, hence, violations of international law are not 'sovereign' acts." *West,* 807 F.2d at 826; H.R.Rep. No. 94–1487, at 14, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613 ("[T]he central premise of the bill [is that] decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which incorporates standards recognized under international law."); *see also Trajano v. Marcos (In re Estate of Marcos Human Rights Litig.),* 978 F.2d 493, 497–98 (9th Cir.1992) ("Congress intended the FSIA to be consistent with international law....").

For guidance regarding the norms against takings in violation of international law, we may look to court decisions, United States law, the work of jurists, and the usage of nations. *See Siderman de Blake,* 965 F.2d at 714–15; *West,* 807 F.2d at 831 n. 10. Nevertheless, we recognize that "[a]t the jurisdictional stage, we need not decide whether the taking actually violated international law; as long as a 'claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of our jurisdiction.'" *Siderman de Blake,* 965 F.2d at 711 (quoting *West,* 807 F.2d at 826).

■ The facts alleged by Altmann fall squarely within the expropriation exception to sovereign immunity. There is no question but that "rights in property" are in issue. The Austrian Republic and Gallery insist on Adele's will as the basis for their legal ownership of the Klimt paintings. Altmann, as a true heir and as a representative of other heirs, asserts the will has no such legal effect and the documents unearthed in 1998 revealed that fact to the current Austrian government and to the Austrian Gallery, which nevertheless have retained possession of the paintings without payment therefor.

■ The next question is whether the property in issue was taken in violation of international law. To constitute a valid taking under international law three predicates must exist. First, "[v]alid expropriations must always serve a public purpose." *West,* 807 F.2d at 831. Second, "aliens [must] not be discriminated against or singled out for regulation by the state." *Id.* at 832. Finally, "[a]n otherwise valid taking is illegal without the payment of just compensation." *Id.* (relying on reports from the Foreign Claims Settlement Commission, international law journals, the *Restatement (Second) of Foreign Relations Law of the United States,* and federal case law). To fall into this exception, the plaintiff cannot be a citizen of the defendant country at the time of the expropriation, because " '[e]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.'" *Siderman de Blake,* 965 F.2d at 711 (quoting *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1105 (9th Cir.1990)).

■ The facts of record, which in this procedural posture we must take as true, show that the Klimt paintings have been wrongfully and discriminatorily appropriated in violation of international law. The Nazis did not even pretend to take the Klimt paintings for a public purpose; instead, Dr. Fuehrer sold them for personal gain or exchanged them to supplement his private collection. In addition, their taking appears discriminatory. Altmann is a Jewish refugee, now a United States citizen, who is a descendant of a Czech family whose property was looted by the Nazis because of their religious heritage. According to Altmann, despite convening a Committee to evaluate expropriation claims and return stolen artwork, the Austrian government intentionally intervened to thwart a fair and impartial vote on the restitution of the Klimt paintings. Further, the Austrian government has not yet returned the paintings to Altmann and her family or justly compensated them for the value of the paintings.[4] Without compensation, this taking cannot be valid. *See West,* 807 F.2d at 832.

■ Finally, the Austrian Gallery is engaged in commercial activity in the

---

4. Austria now claims the Altmann family itself later donated the paintings in exchange for export permits on other artwork returned to the family after World War II. Altmann argues this practice was illegal, as the Austrian government later found, and thus any purported "donation" was legally void. Because this dispute is a mixed factual and legal question, it cannot be resolved on appeal and is best left for the trial court.

United States. Altmann has satisfied the FSIA's statutory nexus requirement by showing that the paintings are owned or operated by an agency or instrumentality of the foreign state, here the Austrian Gallery, which is "engaged in commercial activity in the United States." 28 U.S.C. § 1605(a)(3). The defendants do not contest that the Gallery is an "agency or instrumentality." The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* at § 1603(d).

Altmann argues that the Gallery engages in commercial activity in the United States by authoring, editing, and publishing in the United States both a book entitled *Klimt's Women,* as well as an English-language guidebook, containing photographs of the looted paintings.[5] She also contends that the advertisements in the United States of Gallery exhibitions, particularly those relating to the Klimt paintings, as well as operation of the Gallery itself, constitute commercial activity. The key commercial behavior of the Gallery here is not its operation of the museum exhibition in Austria, however, but its publication and marketing of that exhibition and the books in the United States. *Klimt's Women,* for example, is published in English in the United States by Yale University Press and capitalizes on the images of three of the paintings at issue. That book was published in conjunction with a large exhibition at the Gallery fea-

turing the expropriated paintings. Furthermore, the Austrian Gallery asserts copyright ownership as "authors"; two employees of the Gallery edited the book; and the director of the Gallery is listed as responsible for its content. The museum guidebook is also published in English and features the painting *Adele Bloch–Bauer I* on its cover. The publication and sale of these materials and the marketing of the Klimt exhibition in the United States are commercial activities in and of themselves, but are also a means to attract American tourists to the Gallery. Given that the commercial activity is centered around the very paintings at issue in this action and far exceeds that which we found sufficient to justify applying § 1605(a)(3) in *Siderman de Blake,* 965 F.2d at 709, we must conclude that the Gallery is engaging in commercial activity sufficient to justify jurisdiction under the FSIA.

### III. Due Process and Personal Jurisdiction

■ Austria maintains that even if an exception to sovereign immunity applies, Altmann's suit cannot be maintained unless the district court has personal jurisdiction over the Republic and the Gallery. Under the FSIA, however, personal jurisdiction over a foreign state exists where subject-matter jurisdiction exists and where proper service has been made. 28 U.S.C. § 1330(b). Because we hold that the paintings are subject to the expropriation exception of the FSIA, and there has been proper service of process under § 1608, as the Republic concedes, the court has personal jurisdiction over the Republic and the Gallery.

---

5. *See* Appendix A, cover page of the Austrian Gallery English language guidebook; Appendix B, excerpts from *Gustav Klimt in the Austrian Gallery Belvedere,* authored by Gerbert Frodl, the director of the Austrian Gallery; Appendix C, excerpts from *Klimt's*

*Women,* edited by Tobias Natter, the curator of twentieth century art at the Austrian Gallery, and Gerbert Frodl; and Appendix D, cover page of *Austrian Information,* July/August 2000, published by the Austrian Press and Information Service.

We also hold that, if the facts are as Altmann alleges, the assertion of personal jurisdiction over the Republic and the Gallery complies with the Due Process Clause of the Fifth Amendment. Assuming that a foreign state is a "person" for purposes of the Due Process Clause, *Republic of Argentina v. Weltover*, 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), there must be sufficient "minimum contacts" between the foreign state and the forum "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). *See also Theo. H. Davies & Co. v. Republic of the Marshall Islands*, 174 F.3d 969, 974 & n. 3 (9th Cir.1999) ("[W]e need not decide whether [the government agency] is a 'person' for purposes of the Due Process Clause. We simply assume, without deciding, that both are."). "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir.2000); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). "Where service is made under FSIA section 1608, the relevant area in delineating contacts is in the entire United States, not merely the forum state." *Richmark Corp. v. Timber Falling Consultants, Inc.*, 937 F.2d 1444, 1447 (9th Cir.1991) (internal quotation marks and alterations omitted).

The Republic and the Gallery have sufficient minimum contacts with the United States such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. As previously noted, the Gallery edits and publishes several publications in the United States, two of which capitalize on the very paintings at issue here. The Gallery's publication and marketing of these books is designed to solicit tourism by United States citizens in Austria and to attract those visitors to the Gallery, in particular to view the Klimt works. Both the Republic and the Gallery profit from the sales of the books and the resulting United States tourism.

Furthermore, it is not only the Gallery's activities in the forum, but also actions taken by the Government on behalf of the Gallery that support personal jurisdiction. *See Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir.1981). The Austrian Press and Information Service of the Austrian Embassy has published a tourism brochure advertising the Klimt exhibition at the Austrian Gallery and featuring the portrait of Adele Bloch–Bauer on its cover. This brochure is available at Austrian consulates throughout the United States, distributed to a large mailing list of individuals in the United States, and is widely available on the Internet. The advertisement and promotion of this exhibition directly benefit the Gallery.

The Republic itself does not contest that it has substantial, systematic, and continuous contacts with the United States through its operation of consulates, sponsorship of tourist relations and trade, and promotion of Austrian business interests. The Republic alone operates three consulates in the United States and twenty-six honorary consulates in the United States and its territories.[6] The Austrian Trade

6. *See* Austrian Press and Information Service, *Austrian Offices in the United States, at* <http://www.austria.org/govoff.htm# congen>. In addition to the Consulates General in New York City, Los Angeles, and Chicago, honor-

Commission and Austrian National Tourist Offices operate in both New York and Los Angeles. Austria also recently invested $400,000 in the renovation of the Rudolf Schindler house, a historic architectural landmark in Los Angeles. Thus Altmann has established "continuous and systematic contacts." *Helicopteros,* 466 U.S. at 414–16 & nn. 8–9, 104 S.Ct. 1868; *Siderman de Blake,* 965 F.2d at 709–10 (finding jurisdiction where hotel solicited United States tourism and accepted United States credit cards for payment for guest reservations). We do not hold that these contacts are enough to support general jurisdiction, but they support the reasonableness of the assertion of specific jurisdiction based on the Gallery's publication of books and advertisements featuring the Klimt works. We conclude that fair play and substantial justice would not be offended if we maintain jurisdiction over Austria in this case.

### IV. Joinder of Parties

We reject Austria's contention that Altmann's co-heirs are necessary parties to the litigation requiring dismissal of this action under Rule 19 unless they are joined. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,* 276 F.3d 1150, 1155 (9th Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 98, 154 L.Ed.2d 27 (2002). In determining whether the co-heirs are necessary parties under Rule 19, we consider whether, in the absence of their joinder, complete relief can be accorded to Altmann. *Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992). In the alternative, we consider whether the co-heirs can claim a legally protected interest in the subject of the suit such that a decision in their absence will (1) impair or impede their ability to pro-

tect that interest; or (2) expose the Republic of Austria and Altmann to the risk of multiple or inconsistent obligations by reason of that interest. *See* Fed.R.Civ.P. 19(a)(2); *Clinton v. Babbitt,* 180 F.3d 1081, 1088 (9th Cir.1999). Joinder is "contingent ... upon an initial requirement that the absent party *claim* a legally protected interest relating to the subject matter of the action." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043 (9th Cir.1983) (emphasis added). Where a party is aware of an action and chooses not to claim an interest, the district court does not err by holding that joinder was "unnecessary." *United States v. Bowen,* 172 F.3d 682, 689 (9th Cir.1999).

Although Altmann is an heir to only twenty-five percent of her uncle's estate, her relatives have assigned to her an additional fifty percent of their interest in the estate for purposes of this suit. Another relative, Altmann's cousin, who holds the remaining twenty-five percent interest in the estate does not live in the United States and is aware of the litigation. Given that all necessary parties are aware of the litigation and have chosen not to claim an interest, joinder of these parties is unnecessary to this suit. *See id.* (holding that the district court did not err by finding that a party who was aware of an action but chose not to claim an interest was not a necessary party under Rule 19).

### V. Venue

The Republic and the Gallery also appeal the district court's denial of their motion to dismiss for improper venue. Relying on 28 U.S.C. § 1391(f)(3), the district court found that venue was appropriate in the Central District of California

ary consulates exist in Anchorage, Atlanta, Boston, Buffalo, Charlotte, Columbus, Denver, Detroit, Honolulu, Houston, Kansas City, Miami, Milwaukee, Nassau, New Orleans,

Philadelphia, Pittsburgh, Portland, Richmond, St. Louis, St. Paul, St. Thomas, San Francisco, San Juan, Seattle, and Warwick.

because it is a "judicial district in which the agency or instrumentality is licensed to do business or is doing business." The district court found "no authority that suggests that a foreign agency or instrumentality that engages in 'commercial activity' within a district is not also 'doing business' within a district." *Altmann*, 142 F.Supp.2d at 1215.

We agree with the district court that venue is appropriate in the Central District. Section 1391(f)(3) authorizes venue in any judicial district in which an agency or instrumentality of a foreign state is "doing business" if the agency or instrumentality is sued, and § 1391(f)(4) authorizes venue in the federal district court for the District of Columbia if the foreign state itself is sued. We do not read the statute to require that (f)(3) be the exclusive basis on which venue is available when an agency or instrumentality of the foreign state is sued, or that (f)(4) be the exclusive basis when a foreign state is sued. Sections (f)(3) and (f)(4) are alternative venue provisions, separated by the word "or." Where, as here, both the foreign state and its instrumentality are sued in the same suit, both venue provisions are potentially available. Because the publications and advertisements of the Austrian Gallery that form the basis for jurisdiction under the FSIA have been distributed in the Central District of California, we hold that the Austrian Gallery, an agency or instrumentality of Austria, is "doing business" in the district and that venue is therefore proper in the Central District under § 1391(f)(3). (We also note that an Austrian Consulate is located on Wilshire Boulevard in Los Angeles, a short distance from the federal courthouse; that diplomatic representatives of Austria work in the Central District; and that Altmann, now 86 years old, would be forced to travel to Washington, D.C. to pursue this action, significantly outweighing any inconvenience potentially experienced by the Republic of Austria.)

## VI. Forum Non Conveniens

■ Finally, we hold that the district court did not err in denying Austria's motion to dismiss the action based on the doctrine of *forum non conveniens*. A district court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249–50, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Because this determination is committed to the sound discretion of the district court, Austria faces an uphill battle in persuading us that the district court abused its discretion by denying Austria's motion. *Cheng v. Boeing Co.*, 708 F.2d 1406, 1409 (9th Cir.1983); *see also Leetsch v. Freedman*, 260 F.3d 1100, 1102–03 (9th Cir.2001) (Where the court has considered the availability of an adequate alternative forum, and where it has considered and reasonably balanced all relevant public and private interest factors, its decision deserves substantial deference.).

■ Altmann contends that Austria cannot meet its threshold burden of providing an adequate alternative forum. The district court agreed, finding that because the Austrian filing fees are so oppressively burdensome and Altmann's claims will likely be barred by the thirty-year statute of limitations under Austrian law, these factors render the Austrian courts unavailable.

We disagree that the cost of the lawsuit in Austria, alone, makes this forum unavailable. The mere existence of filing fees, which are required in many civil law countries, does not render a forum inadequate as a matter of law. *See, e.g., Nai–*

*Chao v. Boeing Co.*, 555 F.Supp. 9, 16 (N.D.Cal.1982) (holding that despite filing fees amounting to one percent of claim and an additional one-half percent for each appeal, Taiwan was an adequate forum), *aff'd sub nom, Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983); *see also Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1353 (1st Cir.1992), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993) (fifteen percent Turkish bond would not prohibit court from finding Turkey adequate forum); *Murray v. BBC*, 81 F.3d 287, 292–93 (2d Cir.1996) (England was an adequate forum despite the plaintiff's claim that the American contingency fee system was the only way he could afford a lawyer). Altmann and her co-plaintiffs received significant legal aid based on her petition to the court for a reduction of fees. She did not appeal to further reduce these fees; nor did she apply for an extension of the term of payment of the court fees. Finally, it appears that the fee application was made without calculating the present value of Altmann's home or taking into account the value of a number of porcelain pieces returned by the Austrian government. Arguably, Altmann has greater assets available to her than she listed in her application to the court. Thus the Austrian filing fees are not a basis for finding an inadequate forum.

Nor are we convinced that Austria's statute of limitations bars Altmann's action in that forum. Although Altmann is correct that a thirty-year statute of limitations generally applies to civil claims in Austria, under Austrian law, acts of fraudulent concealment toll the statute. Moreover, the statute of limitations does not prevent Altmann from basing her claims on the 1998 Federal Statute on the Restitution of Art Objects from the Austrian Federal Museums and Collections. This legislation "authorizes the Minister of Finance to return artworks in special instances enumerated in the States where claims could otherwise not be made," including the expiration of a statute of limitations.

■ Nevertheless, our conclusions with respect to the filing fees and the statute of limitations do not compel us to dismiss the complaint on the grounds of *forum non conveniens.* Altmann's choice of forum should not be disturbed unless, when weighing the convenience of the parties and the interests of justice, "the balance is strongly in favor of the defendant." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). To make this determination, we consider both the "private interest" factors affecting the convenience of the litigants, including all "practical problems that make trial of a case easy, expeditious and inexpensive" as well as the "public interest" factors affecting the convenience of the forum, which include the administrative difficulties flowing from court congestion; the local interest in having localized controversies resolved at home; the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.* at 508–09, 67 S.Ct. 839.

Austria claims that the private and public interest factors weigh in favor of conducting a trial in Austria. It argues that the evidentiary sources, the witnesses, and the paintings are all located in Austria and a United States district court would be required to apply Austrian law. We do not agree that these factors outweigh Altmann's choice of forum. Maria Altmann is an elderly United States citizen, who has resided in this country for over sixty years. The requisite foreign travel, coupled with the significant costs of litigating

this case in Austria, weigh heavily in favor of retaining jurisdiction in the United States. Because of the discrete issues presented, this case alone is unlikely to cause much congestion in the courts. Finally, Austria has not set forth any potential conflicts of law beyond the statute of limitations, which it concedes is tolled for fraudulent concealment, as in the United States. Because the Republic of Austria has not made a "clear showing of facts which either (1) establish such oppression and vexation of a defendant as to be out of proportion to the plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems," *Cheng,* 708 F.2d at 1410 (internal quotation marks omitted), we uphold the findings of the district court as to *forum non conveniens.*

## VII. Conclusion

Maria Altmann has alleged sufficient facts which, if proven, would demonstrate that the Klimt paintings were taken in violation of international law. At least as to the Republic of Austria and the national Austrian Gallery, applying the FSIA to the takings of these paintings in the 1930s and 1940s is not an impermissible retroactive application of the Act. Because the remainder of the Act's and other jurisdictional prerequisites are met, the district court properly exercised jurisdiction over Altmann's claims.

AFFIRMED and REMANDED for further proceedings.

EXHIBIT A

Österreichische Galerie
Belvedere
Vienna

A-10

Edited by:
Österreichische Galerie · Belvedere

© Österreichische Galerie · Belvedere, Vienna
and Prestel-Verlag, Munich · New York 1996

Front cover: Gustav Klimt, *Adele Bloch-Bauer I*, 1907
Frontispiece: Richard Gerstl, *Laughing Self-Portrait*, 1908
(see also page 146)

© for the illustrated works, when not held by the following
artists or their estates: Lovis Corinth, James Ensor, Albert
Paris Gütersloh, Alexei Jawlensky, Oskar Kokoschka, Arist-
ide Maillol, Max Slevogt is with VG Bild-Kunst, Bonn, 1995;
Edvard Munch bei The Munch Ellingsen Group/
The Munch Museum/VG Bild-Kunst 1995; Ernst Ludwig
Kirchner with Ingeborg und Dr. Wolfgang Henze, Wichtrach,
Bern; Emil Nolde with Nolde Stiftung, Seebüll.

Photographs: Fotostudio Otto, Vienna
Fritz Simak, Vienna, pp. 10, 11, 12, 13, 14, 16, 17, 18,
19, 65, 172

Prestel-Verlag
Mandlstraße 26
D-80802 Munich, Germany
Tel.: (89)-38 17 09-0; Fax: (89)-38 17 09 -35
and 16 West 22nd Street, New York, NY 10010, USA

Prestel books are available worldwide.
Please contact your nearest bookseller or write
to either of the above addresses for information
concerning your local distributor.

Layout and typeset by Wigelprint, Munich
Lithography by ReproLine, Munich
Printed and bound by Passavia Druckerei GmbH, Passau

Printed in Germany

ISBN 3-7913-1622-2 (English edition)
ISBN 3-7913-1467-X (German edition)

*A-10*

## EXHIBIT B
GERBERT FRODL

in the

AUSTRIAN GALLERY BELVEDERE

in Vienna

VERLAG GALERIE WELZ · SALZBURG

*B-11*

ADELE BLOCH-BAUER I. 1907
Oil, silvering and gilding on canvas, 140 x 140 cm
Signed and dated bottom right: GUSTAV KLIMT 1907
Inventory Nr. 3830
Acquired through a bequest (1936) of the Bloch-Bauer family, Vienna

Novotny/Dobai, Nr. 150
Cf. Strobl I, Nrs. 1054-1151 and IV, Nrs. 3526-3526 p, 3527-3536
First exhibition: unofficially in the Wiener Werkstätte, 1907, and subsequently in the same year at the International Art Exhibition, Mannheim, Nr. 497 a

This portrait of Adele Bloch-Bauer (1881–1925), the wife of the Viennese industrialist Ferdinand Bloch, is the most important work of the so-called "golden style" apart from *The Kiss*; indeed it is often somewhat misleadingly taken as quintessentially Klimtian and as the expression of the Viennese Secession style *par excellence*. Ludwig Hevesi, friend and promoter of the Secession, called the picture an "idol in a golden reliquary holder", correctly drawing attention to its affinity with the Byzantine mosaics in Ravenna, and in particular the 6th century figure of the Empress Theodora in San Vitale. This representative portrait evidently held a special significance for Klimt himself, since he did more than 100 preparatory studies for it over a period of several years. He would seem to have conceived it as a universally valid celebration of a beautiful woman, and thus of the female sex in general, which was to be depicted with all the sumptuousness befitting an empress. Form and content, almost to the exclusion of colour and notwithstanding the inclusion of historical discourse, are here perfectly harmonised in a way that distinguishes Viennese Jugendstil from the related art and decorative fashions of other European cities. Of course there is a danger that the preponderance of multifarious and enormously refined ornamentation may overwhelm the subject matter: however a glance at the exquisite features of the woman, powerfully contrasted with the gold surroundings, immediately renders this danger insignificant.

Adele Bloch-Bauer in her drawing-room.

54

B-12

6-13

ADELE BLOCH-BAUER II. 1912
Oil on canvas, 190 x 120 cm
Signed bottom right: GUSTAV KLIMT
Inventory Nr. 4210
Acquired through a bequest (1928) of Ferdinand Bloch-Bauer.
Formerly in the Bloch-Bauer Collection, Vienna

Novotny/Dobai, Nr. 177
Cf. Strobl II, Nrs. 2074–2112
First exhibition: XI International Art Exhibition, Munich 1913, Nr. 1599

After the high point of his golden style had been reached with the portrait of *"Adele Bloch-Bauer I"* and *"The Kiss"* (see p. 35), Klimt abandoned the use of gold in his work. In its place came a stronger use of colour, which was henceforth to characterise all his painting. The decisive factor behind this change cannot be discovered from any statements by Klimt himself (who very seldom commented on his art), but can be inferred from contemporary tendencies in painting, where colour came to prevail over form (Fauvism in France, Expressionism in Germany). The contrast between the first, golden portrait of Adele Bloch-Bauer and this work, painted five years later, is very great. A marked change in approach is apparent in the composition (from now on Klimt favoured standing models over the somewhat stiff sitting pose), and in the quite different sort of colouring; also in the content, specifically the impression created by the manner and pose of the subject. The latter's "nervous clairvoyance and soul-penetrating urgency" (Novotny) suggest the influence of two painters of the younger generation, Egon Schiele and Oskar Kokoschka; the uncompromising revelation of human nature in their art had so impressed Klimt that he provided both of them with their first opportunity to exhibit before a wider public.

56

β-14

h-15

PORTRAIT OF AMALIE ZUCKERKANDL. 1917/1918
Unfinished
Oil on canvas, 128 x 128 cm
Unsigned
Inventory Nr. 7700
Acquired in 1988 from Viennese private ownership
Formerly in the Zuckerkandl collection, Vienna, the Bloch-Bauer collection, Vienna, and the Müller-Hofmann collection, Vienna

Novotny/Dobai, Nr. 213
Cf. Strobl III, Nrs. 2468–2493
First exhibition: Gustav Klimt Memorial Exhibition, Secession, Vienna, June–July 1928, Nr. 58

Amalie Zuckerkandl (1869–1944) was the wife of the Viennese medical professor, Otto Zuckerkandl, who in turn was the brother-in-law of the journalist, writer and admirer of Klimt's work, Berta Zuckerkandl. In 1914 Klimt had already done a series of pencil studies for Amalie's portrait. Her long absence from Vienna caused the work to be interrupted and it could only be continued in 1917. The portrait shows her sitting; the pose is uncompromisingly head-on, all illusion of space being absent, (this latter feature remaining even in the finished painting). In Klimt's late work the choice of a square format for a portrait is unusual.

ß-16

B-17

BEECHWOOD (Birchwood). 1903
Oil on canvas, 110 x 110 cm
Signed bottom left: GUSTAV KLIMT
Inventory Nr. 4283
Acquired through a bequest (1948) of the Bloch-Bauer family

Novotny/Dobai, Nr. 136
First exhibition: Secession XVIII, 1903 (Nr. 3 or Nr. 4 – both were entitled *"Beechwood"*)

It is hard to decide whether this picture should be called *"Birchwood"* (Novotny/Dobai) or *"Beechwood"* (the latter because manifestly more beeches than birches are depicted); but in any case the decision has little importance beyond epistemological convenience. Klimt painted the interior of a wood several times, on each occasion slightly changing the angle of vision. In the other version of the present picture, painted also in 1903, a patch of bright sky is discernible beyond the tree-trunks. As early as 1901 he had painted a *"Fir forest"*. In all these pictures the predominant colouring is not so much green as the brown and grey tones of the dried leaves on the forest floor and of the bark. Although such works are scarcely comparable to Claude Monet's famous series of nuanced depictions (for example of haystacks), Klimt's few woodland pictures nevertheless exhibit more of the ideas and impact of Impressionism than do his later paintings of gardens and meadows.

74

*B-18*

B-19.

SCHLOSS KAMMER AM ATTERSEE (Waterside Mansion) III. 1910
Oil on canvas, 110 x 110 cm
Signed on the rear, right-hand side: GUSTAV KLIMT
Inventory Nr. 4318
Acquired through a bequest (1961) of the Bloch-Bauer family

Novotny/Dobai, Nr. 171
First exhibition: Gallery H. O. Miethke, Vienna, October/November, 1910

The picture shows the lakeside facade of Schloss Kammer am Attersee near Seewalchen, a 17th century mansion altered and enlarged in the 18th century. In the summer months of the years 1908 to 1912 Klimt lived with the Flöge family in the Villa Oleander in Kammerl near Kammer. It has hitherto been assumed that the picture was painted from a boat, but that cannot be stated with certainty. Between 1908 and 1910 Klimt did three other views of Schloss Kammer (which still exists in unaltered form) – *Schloss Kammer am Attersee I* (Prague, National Gallery), *II* and *IV* (Private ownership, USA and Vienna). The main facade of the Schloss was eternised by the painter in his remarkable *"Allee"* (see p. 87).

80

*B-30*

b-21

APPLE-TREE I. 1911 or 1912
Oil on canvas, 109 x 110 cm
Signed bottom right: GUSTAV KLIMT
Inventory Nr. 3342
Acquired through a bequest (1936) of Adele Bloch-Baue
Formerly in the Bloch-Bauer collection, Vienna

Novotny/Dobai, Nr. 180
First exhibition: Great Art Exhibition, Dresden 1912, Nr. 1832

Trees, and frequently just a lone tree, are a favourite subject of Klimt, their richly suggestive form evidently holding an enduring fascination for him. When the painting is of a single tree, the latter is not so much a particular, attention-drawing feature, but rather the picture's compositional point of reference, the cynosure of nuanced colour. These nuances are achieved by the juxtaposition of differently tinted brush-strokes, the latter supplying individual illumination of green, blue or similar colour. The leaves thus symbolised seem to glow with a light that is more turbulent and agitated than that of the blooming flowers in the foreground. The present picture symbolically recreates the mutuality of nature and light, recalling Klimt's earlier (albeit very different) use of the tree as a symbol, that of the "tree of life". *"Apple-tree I"* is regarded to be one of the artist's most profoundly private and meditative works.

84

*β-22*

6-23

HOUSES IN UNTERACH AM ATTERSEE. Around 1916
Oil on canvas, 110 x 110 cm
Unsigned
Inventory Nr 4209
Acquired in 1948 through the Bloch-Bauer bequest, Vienna

Novotny/Dobai, Nr. 199
First exhibition: Gustav Klimt Memorial Exhibition, Secession, Vienna, June–July 1928, Nr. 26

Klimt's late landscapes may be differentiated in several ways from the earlier ones: in particular there is more emphasis on colour as a compositional element, a development that is directly related to the greater freedom in painting generally at that time. This freedom is, of course, reflected in all of Klimt's work. In contrast to his earlier representations of pure nature (gardens, meadows and water), he now devoted himself to architectonic motifs, principally the villages along the banks of the Attersee. The impetus for this change may have been provided by a stay on Lake Garda in the summer of 1913, when he painted two views of small, waterside towns. In the present work he integrates the blocks of houses into the surface of the picture, scarcely bothering about foreshortening and perspective. The smooth, colourful walls are contrasted with the rather loosely painted trees. On the bank can be seen flowers painted with detailed precision. The picture dates to a period when the artist was spending the summer months at Weißenbach am Attersee with the Flöges, for whom he was practically one of the family. It was at Weißenbach also that Klimt painted the two views of the forester's house that he himself occupied each summer between 1914 and 1916.

B-24

6-35

EXHIBIT C

# Klimt's Women

Edited by
Tobias G. Natter and Gerbert Frodl

Texts by
Neda Bei
Hans Bisanz
Marian Bisanz-Prakken
Alessandra Comini
Franz Eder
Lisa Fischer
Gerbert Frodl
Daniela Hammer-Tugendhat
Jeroen van Heerde
Hansjörg Krug
Tobias G. Natter
Monika Pessler
Regine Schmidt
Thomas Trummer
Heidemarie Uhl
Angela Völker

**DUMONT**

*C-26*

This catalogue has been published to accompany the Millennium exhibition "Klimt und die Frauen", 231st temporary exhibition of the Österreichische Galerie Belvedere, Vienna, from 20 September 2000 to 7 January 2001.

Exhibition

Concept
Tobias G. Natter

Curators
Tobias G. Natter, Regine Schmidt

Exhibition assistant
Christiane Böker

Exhibition architecture
Dimitris Manikas
Doris Kristandl (Assistant)

Exhibition construction
Wolfgang Mahr and Gerhard Davit,
Christian Kochmann, Georg Lucina,
Helmut Messaros, Mario Nitsch,
Herbert Pitzer, Norbert Stocker,
Franz Zwickelsdorfer
and Artex, Vienna

Art restoration
Elisabeth Foissner, Erhard Stöbe,
Bettina Urban

Public Relations
Klaus Pokorny,
Sandra Maria Ziegerhofer (Assistant)

Art mediation
Petra Schrock, Tamara Loitfellner,
Christian Huemer

Sponsoring
Hannelore Talburg

Catalogue

Catalogue editors
Tobias G. Natter, Christiane Böker

Copy editing
Carmen Sontgerath

Translations
Nikolas Bertheau, Pauline Cumbers, Michael
Eldred, Ishbel Flett, Eileen Martin

Design
Birgit Haermeyer

Production
Peter Dreesen, Marcus Muraro

Colour separations
Litho Kocher, Cologne
Eichhorn, Frankfurt

Printing
Rasch, Bramsche

Binding
Bramscher Buchbinder Betriebe

Library of Congress Card Number
00-108343

A Catalogue record for this book is available
from the British Library

© 2000 Österreichische Galerie Belvedere,
Vienna, and DuMont Buchverlag, Cologne
© on the texts the authors
Responsible for the content: Gerbert Frodl,
director of Österreichische Galerie Belvedere
© VG Bild-Kunst, Bonn 2000, on the works
of Giovanni Boldini, Oskar Kokoschka, Henri
Matisse, Edvard Munch, Kees van Dongen

Distributed by Yale University Press,
New Haven and London

Printed in Germany
ISBN 0-300-08796-9

*C-27*

# Portrait of Adele Bloch-Bauer I

GUSTAV KLIMT

1907

Oil, silver and gold plating on canvas, 138 x 138 cm
Marked on the lower right "Gustav—Klimt.—/1907"
Vienna, Österreichische Galerie Belvedere, Inv. No. 3830
(Novotny-Dobai No. 150)

The portrait of Adele Bloch-Bauer is arguably the most famous Klimt portrait and a chief work of his so-called "golden style". Adele Bloch-Bauer was twenty six years old when Klimt painted her, yet nothing juvenile can be detected in the portrait. The history of the picture goes back a long way. Like no other portrait, Klimt prepared it with numerous drawings and studies, which Strobl dates to 1903/04, assuming that a realisation of the picture in gold was planned even then.[1] The early date is confirmed by a letter from Adele Bloch to Julius Bauer dated 22 August 1903, in which she discusses the plans for the wedding anniversary of her parents on 15 October 1903. "Originally, we children wanted to make them a joint present, but now we have totally abandoned the idea. My husband decided to have me painted by Klimt who, however, cannot start work before winter. So my parents will just have to be patient."[2]

The picture was first exhibited as part of a presentation of objects of the Wiener Werkstätte in Mannheim in spring 1907.[3] The first encounter with the Viennese public took place on the occasion of the Kunstschau in 1908.[4] In the Wiener Allgemeine Zeitung, one could read about an "idol in a golden shrine",[5] while disapproving voices stated mockingly: "More Blech than Bloch".[6]

The subject is sitting or rather floating in front of a golden chair whose back reveals itself only to the most attentive eye. All details of the picture—especially the subject's body—seem to dissolve in the splendour of the golden shimmer. As with Byzantine idols, only the face and the hands remain visible under the gold. Still under the 'revelation's' spell, Klimt reported from Ravenna in 1903: "(...) the mosaics of unprecedented splendour."[7]

For Hevesi, it was "mosaic painting", with the woman's portrait a cross between painting and handicraft, executed with the meticulousness of a goldsmith. Johannes Dobai ascribed a structural role to the gold colour: "In this case, gold symbolises body as well as space, denseness as well as lightness in a world detached from itself."[8]

Mosaic from Ravenna: Empress Theodora

Klimt used this gold in different ways: in the spirit of Japanese lacquer painting in the background, producing a diffuse lustre, or making the pattern stand out in full relief and enriching it with real gold plating. The strongest inner contradiction arises between the naturalistically conceived motifs and their ornamental stylisation. The subject's coat, opening wide at the side, is treated as a sweeping zone of texture. The garment visible underneath is strewn with Egyptian god's-eye motifs, and hangs on thin straps from the narrow shoulders. The magic of the geometry, the orches-

1 Strobl, Vol 1, pp. 301f. and Nos. 1054-1151, and Vol 4, Nos. 94/II–35.51c
2 Österreichische Nationalbibliothek, autograph collection, sign. 577/52-1.
3 International art exhibition, Mannheim, 1907, Cat. No 492a.
4 See catalogue of the Kunstschau Wien, room 22, No 1 (Porträt der Frau A. B.").
5 Wiener Allgemeine Zeitung, 6 June 1908.
6 Blech, German for "sheet metal", "rubbish" (translator's note). Fritz Novotny attributes this dictum to the journalist Julius Bauer, see letter from Fritz Novotny to Johannes Dobai of 13 February 1980. In the artist's archives of the Österreichische Galerie Belvedere, Klimt folder No XII, Nebehay, 1969, p. 475, note 11, suspects the Klimt opponent Eduard Pötzl of being the author of the judgement
7 Card to Emilie Flöge of 4 December 1903, as quoted in Fischer 1987, p. 174.
8 Johannes Dobai, "Die Landschaft in der Sicht von Gustav Klimt—Ein Essay", in Mitteilungen der Österreichischen Galerie, years 7/23, 19/18/79, Nos. 66/67, Salzburg 1978, p. 256

tration of squares and circles and the alternation of spiral and triangular ornaments are further enhanced by the compositional ambivalence that allows us to see Adele Bloch-Bauer in a sitting as well as in a standing position, thus transforming the easy chair into something completely irrational and decorative.

The picture suggests not only Adele Bloch-Bauer's restlessness and her denial of society's expectations, but also the element of conflict within the gender role. The full lips and the red cheeks contribute little to the vividness. The ornamental stiffness conflicts with the conception of the human being; an unresolved dialogue that already characterised the majesty of the Empress Theodora in Ravenna. Gold as the colour of merciless ceremonial is reminiscent of Egyptian pretensions to eternity, the profanity of the medieval gold ground panel painting, but also the exoticism of Japanese lacquer painting.[9]

Whether there was a liaison amoureuse between Klimt and Adele Bloch-Bauer, as has often been speculated, remains questionable. Such a relationship was suggested by the American psychiatrist Salomon Grimberg whom many others followed.[10] Hubertus Czernin, however, who has recently concerned himself with Adele Bloch-Bauer in great detail, rather doubts the possibility of a love relationship.[11]

Adele Bloch-Bauer, photograph c. 1900. Österreichische Galerie Belvedere, archives

Adele Bauer was born as the daughter of the banker Moriz Bauer and Jeannette Bauer, née Honig, in Vienna on 9 August 1881.[12] As a member of the country's economic elite, her father, in his capacity as Generaldirektor, controlled the fortunes of the seventh biggest bank in Austria-Hungary, the Wiener Bankverein, and was the President of the Orientbahn.[13]

On 19 December 1899, Adele married the industrialist Ferdinand Bloch who was seventeen years her senior.[14] It was a marriage "based on mutual respect rather than love. They respected each other tremendously."[15] In the summer of 1899, the young Alma Mahler, later one of Adele's best friends, noted: "Adele Bauer, next to her hideous fiancé."[16] This marriage of convenience was matched by the marriage of Adele's sister Thedy, currently Marie-Therese, to Ferdinand Bloch's brother, the lawyer Dr. Gustav Bloch. Since all male descendants of the Bloch family later died out, the families changed their name officially in 1917, henceforth calling themselves Bloch-Bauer.

Ferdinand Bloch, who came from Bohemia, where he attended the commercial college in Prague, was born on 16 July 1864 and developed his father's company into one of the biggest sugar factories in Central Europe. The marriage remained without issue. Adele lost two children during pregnancy, a third one died a few days after its birth. After the collapse of the monarchy in 1918, the Bloch-Bauer couple that had lived before in Wien IV, at 10 Schwindgasse,[17] opted for Czechoslovakian citizenship with a residence in Schloss Jungfer Brezan near Prague.[18]

9 — the Viennese picture and of Japonisme see the origani... Vienne exhib cat., Jüdu Museum of Art, The Austrian Museum of Applied Arts, Vienna, et al., 1994 also Mabuchi, "Klimt and the Decoration—Japonisme in Viennese Painting", pp. 202-212
10 Salomon Grimberg, "Adele— Private Love and Public Betrayal", in Art & Antiques, 16 & 5avte, Summer edition 1986, pp. 70ff
11 Hubertus Czernin Die Fälschung—Der Fall Bloch-Bauer, vol. I, 1999, esp. the chapter "Werd a & Deis", p. 97ff.
12 See IKG, Wien, register of births, entry 21/586/VII/1881 however, according to the IKG, deaths register of marriages, entry 1 06/37/1899, the date of birth is 2 Apr 1881.
13 Brandstätter 1994, pp 136-138 Der Standard, Vienna, 8 Mar, 1997 for Adele Bloch-Bauer and her family's general relations see Hubertus Czernin cf. above, pp 50f
14 IKG Wien, register of marriages, entry 1106/13/1899 states Adele Bloch Bauer withdrew from the orthodox religious community. No exact date can be established in the post mortem protocol. Still A for profession of faith is given as "unchurched"
15 Communication from Frau Marie Altmann, 3 March 1999
16 29 August 1899, Mahler 1997, p. 35.
17 Lehmann 1910
18 See also Nebehay 1994, note 17, p. 320.

C-39

Maria Altmann, the only niece still alive, remembers her aunt whose principle of life demanded an exclusive orientation toward the intellectual. She describes Adele with the following attributes: "Sick, suffering, always with headache, smoking like a chimney, terribly frail, dark. A spiritual face, slim, elegant. 'Complacent, arrogant', that was the impression she made on me when I was a child. Always seeking intellectual stimulation." The niece also mentions a crippled finger that the aunt always tried to conceal. This is reportedly why Klimt chose this particular hand position in the portrait.

Adele Bloch-Bauer, photograph c. 1920 Archives Christian Brandstätter, Vienna

In December 1919, Ferdinand Bloch-Bauer bought the house at 18 Elisabethstraße, nearly opposite the Akademie in Schillerplatz. Here, Adele Bloch-Bauer practised the hospitality that had turned her house into one of the centres of the Viennese Fin de Siècle. In the 1920s, she continued to gather intellectuals, artists and Social Democratic politicians round her: Alma Mahler-Werfel and her husband, Richard Strauss, Stefan Zweig, Jakob Wassermann, Karl Renner, and Julius Tandler frequented her house. As her niece Maria Altmann remembers, "Adele was not happy at home. She wanted to study, which was not customary for a young girl at that time, so she married instead."[19] She was a disciplined woman who had intensively studied German, French and English literature.

Adele Bloch-Bauer died on 24 January 1925.[20] When two days later her corpse was cremated, which was forbidden by the Catholic church, Adele once again demonstrated her sympathy for social democracy.[21] Out of a characteristic sense of social responsibility, she left her Klimt pictures to the then "Moderne Galerie", now Österreichische Galerie Belvedere, with the charge, however, that the pictures remained at her husband's disposal while he was alive. After Adele's death, her room with a view of Schillerplatz was turned into a "commemorative room" always decorated with fresh flowers.[22] On the walls hung the two Klimt portraits flanked by four Klimt landscapes, with the master's photograph on a side table next to the chaise longue.

A little more than a decade after Adele's death, the Nazis took over. After the *Anschluß*, Ferdinand Bloch-Bauer's fortune including his valuable art and porcelain collection was Aryanised. At that time, the Klimt pictures were also confiscated. This is the basis of Ferdinand Bloch-Bauer's heirs' restitution claims, which they plan to put forward in an action against the Republic of Austria for return of the pictures. Apart from the legal argument, the way Austria is dealing with the dark sides of its past thus becomes the subject of politico-social and politico-cultural debates.[23]

Ferdinand Bloch-Bauer who successfully emigrated first to Czechoslovakia and, after its occupation, to Switzerland, died in Zurich on 13 November 1945. The fact that he was laid to rest next to his wife in the urn grove of the Wiener Zentralfriedhof, is strangely touching.

19 *Der Standard* Vienna, 8 March 1899.
20 WStLA, post mortem protocol. See also the necrologue in the *Neue Freie Presse*, Vienna, 25 January 1925.
21 WStLA, post mortem protocol.
22 Statement by Maria Altmann, see note 18. See also *Der Standard*, Vienna, 11 November 1998.
23 For details, see Hubertus Czernin who in March 1999 in the Viennese daily paper *Der Standard* published a comprehensive series available also in book form. See note 11.

*C-31*

# Portrait of Adele Bloch-Bauer II

GUSTAV KLIMT

1912
Oil on canvas, 190 x 120 cm
Marked on the lower right:
"Gustav—/Klimt"
Vienna, Osterreichische Galerie
Belvedere, Inv. No. 4210
(Novotny-Dobai No. 177)

Adele Bloch-Bauer was the only woman who had enough wealth and enthusiasm for the arts to be painted twice by Klimt. Unlike the first picture (ill. p. 116) where the subject is sitting, this time Klimt shows the lady standing, a compositional decision that apparently had been clear to the painter from the outset.[1] Klimt divides the background into asymmetrically staggered areas of violet, red, pink and green. Galloping riders—motifs taken from Asian examples—enliven the topmost zone.

There is a huge difference between the two Bloch-Bauer portraits. With the standing portrait of Adele Bloch-Bauer, Klimt's development took a completely new course. In a lecture about the painter in 1912, the art historian Hugo Haberfeld talks about an "auspicious" new beginning: "(...) now the artist is going to paint a naturalistic portrait, so to speak, of the lady he has previously formed hieratically in gold and silver like an idol."[2]

Yet "naturalistic, so to speak" is only an allusion to what is new. The novelty lies primarily in the use of colour. This vividness of colour, as well as the new freedom in its application, can already be found in Klimt's landscapes, but now for the first time these factors play a role in the portraiture. It is generally believed that these tendencies were influenced by the young Henri Matisse.[3] Obviously, the Fauves' presentation at the Wiener Internationale Kunstschau in 1909 had made a vivid impression on Klimt, as had also the experience of his travels to Paris in 1909 and Brussels in 1911 where he attended the mounting of his frieze in the Palais Stoclet.

In comparison with the portrait Adele Bloch-Bauer I (ill. p. 116), a new relationship to corporeality as well as ornamentation becomes apparent. Both notions are redefined rather than abandoned. The carpet's splendid patterns run into each other. The body silhouette becomes a richly undulating, almost arabesque-like outline reminiscent of the one of Elisabeth Bachofen-Echt where it was described by Hatje as "vase-like strict form".[4]

1 Again, Alice Strobl, Vol. 2, p. 265, and Vol 4, Nos. 3637–3638a, notes that no studies in other positions are known
2 Hugo Haberfeld, "Gustav Klimt", in *Die Kunst—Monatsheft für freie und angewandte Kunst*, year 13, No 4, January 1912, Munich, p 183
3 Novotny-Dobai, p. 391
4 Ingomar Hatje, *Gustav Klimt Ein Maler des Wiener Jugendstils*, Graz 1955, p. 98.

C-33

C-34

# Portrait of Amalie Zuckerkandl

GUSTAV KLIMT

**1917/18 (unfinished)**
Oil on canvas, 128 × 128 cm
Unmarked
Vienna, Österreichische Galerie
Belvedere, Inv. No. 7700
(Novotny-Dobai No. 213)

Gustav Klimt.
Study for the portrait of
Amalie Zuckerkandl, 1917/18
Pencil, 568 × 371 mm
Vienna, Historisches Museum der
Stadt Wien, Inv. No. 114 949
(Strobl No. 2482)

Amalie, correctly Miriam Amalie, Zuckerkandl was born to the playwright Sigmund Schlesinger on 1 August 1869. On 2 July 1895, she converted to Judaism, and a week later she married the surgeon and urologist Dr. Otto Zuckerkandl who later became university professor and head of the surgical department of the hospital of the Jewish community.[1]

Amalie and Otto Zuckerkandl's close relationship with Gustav Klimt had been arranged by Amalie's sister-in-law Berta Zuckerkandl (1864–1945), the anatomist Emil Zuckerkandl's wife. Known as the "revolutionary privy councillor",[2] Berta Zuckerkandl also fought within the wealthy Zuckerkandl clan for active support for modern trends and the avant-garde.

The portrait of Amalie Zuckerkandl remained unfinished. The face and the décolletage are worked through while the arms and the garment are only sketched and the background just indicated. The subject is sitting upright facing the viewer, the easy chair disappears behind the wide-sweeping flower-trimmed garment and her scarf. The scarf constitutes a moment of casualness in the strong en-face structure, seemingly slipping from her shoulders.

Concerning the picture's history, Alice Strobl observed that there are two stylistically quite different groups of preliminary sketches. In the first group are those dating from 1914 when Klimt started work on the picture, having perhaps already received the order in 1913. During the First World War, however, Amalie Zuckerkandl followed her husband to Lvov where she served as a nurse in his hospital in 1915/16. Klimt seems to have continued on the project only after the Austrian loss of Lvov and the couple's return to Vienna.[3] On 5 November and 12 December 1917, the painter received payments of 2,000 crowns each.[4]

The fact that the picture remained unfinished symbolises the decline of Klimtian aesthetics and the world they arose in, which in its belief in an elite art ceased to exist after 1918. But it may also stand for the radical failure of Jewish assimilation. In 1942, the Nazis deported Amalie Zuckerkandl together with her younger daughter to Theresienstadt and presumably murdered them in the Belzec extermination camp.

1 See IKG Wien, proselyte protocol Ottakring 7/1895, and register of marriages, entry 618/16/1895. For Otto Zuckerkandl, see WStLA, biographical collection. Born in Györ (Hungary) on 28 December 1861, died in Vienna on 1 July 1921. The marriage was divorced in 1919.
2 Nebehay 1992, p. 711
3 Communication from Hermine Müller-Hoffmann, Amalie's daughter, as quoted in Strobl, Vol. 3, p. 85. See also Brandstätter 1992, p. 334.
4 See list of income 1917 in Klimt's sketchbook, as quoted in Strobl, Vol. 3, p. 242.

C-35

C-36

# AUSTRIAN
# INFORMATION

WASHINGTON DC Volume 53 No 7/8 July/August 2000

## VIENNA MODERNISM
## 1890 - 1910

AUSTRIAN INFORMATION, in a series of issues, will present its readers with Austrian Modernism
Picture above: "Lady in Gold" (Portrait Adele Bloch-Bauer) by Gustav Klimt, oil, 1907, Austrian Gallery

*E-44*