Chava ANDERMAN, et al., Plaintiffs,

v.

FEDERAL REPUBLIC OF AUSTRIA, et al., Defendants.

No. CV01–01769FMCAIJX.

United States District Court, C.D. California.

April 15, 2003.

---

Herbert L. Fenster, Robert L. Carter, Jr., Christina M. Carroll, McKenna Long Aldridge, Washington, DC, Joseph F. Butler, McKenna Long & Aldridge, Los Angeles, CA, for Plaintiff.

Nina Nagler, Konrad L Cailteux, Weil Gotshal & Manges, New York, NY, Richard P Tricker, Richard P Tricker Law Offices, Los Angeles, CA, for Defendants.

## ORDER GRANTING MOTIONS TO DISMISS

COOPER, District Judge.

This case arises out of events that occurred in Austria during the Nazi era. The allegations in this action chronicle the deprivation of property that often accompanied the greater horrors—murder, genocide, slave labor, and forced labor—of the Holocaust. Claims such as these have been the subject of many international diplomatic efforts over the last half century. None of these efforts have come close to rendering perfect justice to those wronged during this dark period in our history. This Court would be under a solemn duty to render some measure of justice to those wronged, were it within its power to do so. Reluctantly, however, the Court concludes that adjudication of the claims asserted by Plaintiffs is beyond its constitutional authority.

### I. Parties

Plaintiffs in this action are Jews who were citizens, nationals, or residents of Austria in 1938, as well as their descendants, heirs, legatees, assigns, and beneficiaries. (FAC ¶ 21).

Defendant Federal Republic of Austria ("Austria") is a foreign state. (FAC ¶ 362). Austria was invaded by Germany in March 1938 ("the Anschluss") and became part of Germany at that time. (FAC ¶ 24). Austria was liberated by the Allied Forces in 1945, and was later restored as a

democratic state in 1955 by the State Treaty for Re–Establishment of an Independent and Democratic Austria ("STRIDA"). (FAC ¶ 36).

Defendant Dorotheum is an auction house. (FAC ¶ 363). Plaintiffs allege that Dorotheum is owned and controlled by Austria, through its instrumentality, Österreichische Industrie AG ("ÖIAG"), which is also a Defendant in this action. (FAC ¶ 363). ÖIAG serves as a holding company for commercial enterprises owned by Austria. (FAC ¶ 364).

Collectively, the Court refers to Austria, Dorotheum, and ÖIAG as "the Austrian Governmental Defendants."

Defendant Donau Allgemeine Versicherungs Aktiengesellsschaft ("Donau") is an insurance company that is alleged to have sold insurance policies to Austrian Jews before 1938. (FAC ¶ 373). Plaintiffs allege that Donau failed to pay on these policies. (FAC ¶ 373).

Defendant Union Versicherung AG ("Union") is an insurance company that is alleged to have sold insurance policies to Austrian Jews before 1938. (FAC ¶ 374). Plaintiffs allege that Union failed to pay on these policies. (FAC ¶ 374).

Defendant Uniqa Personenversicherung AG ("Uniqa") is an insurance company that is alleged to have sold insurance policies to Austrian Jews before 1938. (FAC ¶ 375). Plaintiffs allege that Uniqa failed to pay on these policies. (FAC ¶ 375).

Defendant Wiener Staedtische Allgemeine Versicherung ("Wiener Staedtische") is an insurance company that is alleged to have sold insurance policies to Austrian Jews before 1938. (FAC ¶ 377). Plaintiffs allege that Wiener Staedtische failed to pay on these policies. (FAC ¶ 377).

Defendant Interunfall Versicherung AG ("Interunfall") is an insurance company that is alleged to have sold insurance policies to Austrian Jews before 1938. (FAC ¶ 369). Plaintiffs allege that Interunfall failed to pay on these policies. (FAC ¶ 369).

Collectively, the Court refers to Defendants Donau, Union, Uniqa, Wiener Staedtische, and Interunfall as "the Insurance Defendants."

## II. Plaintiffs' Claims

### A. Factual Allegations

The First Amended Complaint ("FAC") is a detailed document, consisting of over 200 pages and almost 500 paragraphs. The allegations in the FAC are merely summarized here.

Plaintiffs allege that beginning in 1933 and continuing through 1945 (and thereafter), Austrian Jews were deprived of property through theft, intimidation, coercion, and discriminatory taxes. (FAC ¶ 20). These practices were especially pronounced during the Anschluss, or German annexation of Austria in 1938. (FAC ¶¶ 24–30). The FAC details the property taken. The property at issue includes real estate (homes, land, factories, and warehouses), liquid assets (cash, stocks, bonds, commercial papers, gold), equipment, automobiles, household items (furniture, artwork, rugs, silver cutlery and candlesticks), jewelry, and watches.

In April 1938, Austrian Jews were required to register their property by June 1938. (FAC ¶ 25). In November 1938, Austrian Jews were prohibited from conducting financial or property transactions. (FAC ¶ 26). This prohibition was to be effective in January 1939, but in practice the prohibition became effective in December 1938. (FAC ¶ 27).

Austria was liberated by Allied Forces in 1945. (FAC ¶ 35). In May 1955, the Allies granted Austria independence subject to STRIDA. (FAC ¶ 36). STRIDA required payment of restitution and repa-

rations to Austrian Jews. (FAC ¶ 36; 6 UST 2369, 1955 WL 44063 (U.S. Treaty)). In June 1955, the United States ratified this treaty. (*Id.*).

Approximately half a century later, in January 2001, Austria and the United States entered into a proposed settlement with Austrian Jews and their heirs worldwide regarding Holocaust-related claims (including claims such as those at issue in this action). (FAC ¶ 40).

Insurers sued in this action claim the only avenue of relief involves the International Commission on Holocaust Era Insurance Claims ("ICHEIC"). (FAC ¶ 42).

## B. Plaintiffs' Claims

In their first cause of action, Plaintiffs assert a claim against the Austrian Governmental Defendants based on the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602—1611 ("FSIA").

In their second cause of action, Plaintiffs assert a claim against all Defendants, alleging that they confiscated property (and/or conspired to plunder and transact in plundered property) in violation of customary international law, including: the United Nations Charter; the Universal Declaration of Human Rights; the Nuremberg Principles of 1950; the Nuremberg Charter; the Hague Convention IV, Respecting the Laws and Customs of War on Land of 1907 (Article 46), the Geneva Conventions (especially Article 3(1)). Plaintiffs also accuse Defendants of war crimes and crimes against humanity.

In their third cause of action, Plaintiffs allege that the Austrian Governmental Defendants breached Art. 26, ¶ 1, of STRIDA. This provision requires Austria to pay reparations to individuals who had property seized because of racial origin or religion. *See* 6 UST 2369, 1955 WL 44063 (1955).

In their fourth and fifth causes of action, Plaintiffs seek imposition of a constructive trust as to all Defendants, and allege that all Defendants breached a fiduciary duty owed to Plaintiffs by seizing property and turning it over to the Nazis without Plaintiffs' consent.

In their sixth and seventh causes of action, Plaintiffs assert claims based on unjust enrichment and conversion against all Defendants.

In their eighth cause of action, Plaintiffs assert against the Insurance Defendants a claim based on the Alien Tort Claims Act, 28 U.S.C. § 1350.

In their ninth cause of action, Plaintiffs assert a breach of contract claim against the Insurance Defendants.

Plaintiffs' tenth cause of action asserts a claim under the California Holocaust Victim Insurance Relief Act of 1999 ("HVIRA") against the Insurance Defendants.

In the eleventh cause of action, Plaintiffs seek an accounting from all Defendants.

Finally, the twelfth cause of action asserts a claim under California's unfair business practices law, Cal. Bus. & Prof'l Code § 17200, et seq., against all Defendants.

## III. Court's Power to Decide Threshold Issues

In a previous Order, the Court held that service was insufficient as to all Defendants except Austria. The Court ordered Plaintiff to serve the remaining Defendants in conformity with Fed.R.Civ.P. 4(f)(2)(C)(ii) and 28 U.S.C. § 1608(b).

At that time, the Court was of the opinion that it should not decide issues of subject-matter jurisdiction and justiciability prior to determining whether it had personal jurisdiction over the Defendants. At the hearing on this matter, counsel for Defendants argued that the Court has the power to decide certain threshold issues, including subject-matter jurisdiction and justiciability, without first determining

whether it has personal jurisdiction. Defendants relied on *Ruhrgas AG v. Marathon Oil Company,* 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999), and *In re Papandreou,* 139 F.3d 247 (D.C.Cir.1998). Upon examination of the relevant authority, the Court agrees with Defendants on this matter.

In *Steel Company v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Supreme Court held that district courts may not presume they have subject-matter jurisdiction in an action in order to proceed to the merits of the claims presented in that action. The following year, the Supreme Court clarified the holding of *Steel Company,* holding that a court may determine whether it has personal jurisdiction over a party before proceeding to determine whether it has subject-matter jurisdiction. *See Ruhrgas,* 526 U.S. at 577–78, 119 S.Ct. 1563. The Court noted that "customarily, a federal court first resolves doubts about its jurisdiction over the subject matter, but [that] there are circumstances in which a district court appropriately accords priority to a personal jurisdiction inquiry." *Id.* at 578, 119 S.Ct. 1563. Therefore, *Ruhrgas* establishes that the Court may address issues of subject-matter jurisdiction prior to addressing personal jurisdiction.

*Ruhrgas* also establishes that the Court can decide issues of justiciability as threshold issue. The Supreme Court stated:

> While *Steel Co.* reasoned that subject-matter jurisdiction necessarily precedes a ruling on the merits, the same principle does not dictate a sequencing of jurisdictional issues. A court that dismisses on ... non-merits grounds such as ... personal jurisdiction, before finding subject-matter jurisdiction, makes no assumption of law-declaring power that violates the separation of powers principles underlying ... *Steel Company* .... It is hardly novel for a federal

court to choose among threshold grounds for denying audience to a case on the merits.

*Ruhrgas,* 526 U.S. at 584–85, 119 S.Ct. 1563. From this discussion, it is clear that a court may decide among threshold issues (such as subject-matter jurisdiction, personal jurisdiction, justiciability, standing, and ripeness). The concern that underlies the restriction on which issues a court must decide first focuses on safeguarding against a court overstepping its power to adjudicate. Here, the Court is not precluded from making an inquiry into whether it must decline jurisdiction under the political question doctrine; to the contrary, the underlying concern of the Supreme Court as articulated in *Ruhrgas* appears to compel such an inquiry.

Plaintiffs argue that the Court should follow the lead of the court in *Whiteman v. Federal Republic of Austria,* No. 00 Civ. 8006(SWK), 2002 WL 31368236 (S.D.N.Y., Oct.21, 2002), which held that it should determine subject-matter jurisdiction under the FSIA before determining whether the political question doctrine required it to decline to exercise jurisdiction. This proposition is not without authority, notwithstanding the discussion from *Ruhrgas* quoted above. Support for this proposition can be found in the text of the political question doctrine itself: The political question doctrine holds that a federal court *having jurisdiction over a dispute* should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government. *See, e.g., Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424, 483–84 (D.N.J. 1999); *cf. In re Papandreou,* 139 F.3d 247 (noting that "[w]hile such abstention [under the doctrine of forum non conveniens] may appear logically to rest on an assumption of jurisdiction, ... it is as merits-free as a finding of no jurisdiction."); *cf. Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 707 (9th Cir.

1992), *cert. denied,* 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993) (holding the act of state doctrine is not jurisdictional and bars an action, if at all, for the failure to state a claim upon which relief can be granted). Accordingly, the Court discusses whether Plaintiffs have stated claims under the FSIA before discussing the political question doctrine.[1]

## IV. Foreign Sovereign Immunities Act

■ Plaintiff brings claims against Austria, ÖIAG, and Dorotheum under the Foreign Sovereign Immunities Act. The FSIA is the sole basis for jurisdiction over a foreign state and its agencies and instrumentalities. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).

■ Although the FSIA was passed after the occurrence of the events giving rise to this action, the FSIA applies to Plaintiffs' claim. *See Altmann v. Republic of Austria,* 142 F.Supp.2d 1187, *aff'd,* 317 F.3d 954 (2002).

■ Under the FSIA, foreign states are presumed to be immune from the jurisdiction of the United States courts unless one of the FSIA's exceptions applies. 28 U.S.C. § 1604. There are three such exceptions that arguably have applicability here: the waiver exception (§ 1605(a)(1));

the commercial activity exception (§ 1605(a)(2)); and the expropriation exception (§ 1605(a)(3)).

## A. Waiver Exception

■ The waiver exception to sovereign immunity provides:

> (a)A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver ....

28 U.S.C. § 1605(a)(1). Waiver of sovereign immunity may be explicit or implicit. *Id.* The Ninth Circuit has held that the waiver provision should be construed narrowly. *See Corzo v. Banco Central De Reserva Del Peru,* 243 F.3d 519, 523 (9th Cir.2001).

Plaintiffs argue that because Austria has explicitly waived its sovereign immunity, the Court need not consider Defendants' argument regarding the standard to apply in determining whether Austria has implicitly waived its sovereign immunity. Plaintiff's argument is unpersuasive. Plaintiffs argue that Article 26 of STRIDA[2] contains

---

1. Plaintiff's counsel also suggested that the Court must consider the constitutionality of the claims against the Insurance Defendants before considering whether the claims against them are barred by the political question doctrine. The Court, in its research, has found no such requirement.

2. In its entirety, Article 26 of STRIDA states:
 Property, Rights and Interests of Minority Groups in Austria
 1. In so far as such action has not already been taken, Austria undertakes that, in all cases where property, legal rights or interests in Austria have since 13th March, 1938, been subject of forced transfer or measures of sequestration, confiscation or

control on account of the racial origin or religion of the owner, the said property shall be returned and the said legal rights and interests shall be restored together with their accessories. Where return or restoration is impossible, compensation shall be granted for losses incurred by reason of such measures to the same extent as is, or may be, given to Austrian nationals generally in respect of war damage.
 2. Austria agrees to take under its control all property, legal rights and interests in Austria of persons, organizations or communities which, individually or as members of groups, were the object of racial, religious or other Nazi measures of persecution where, in the case of persons, such

an explicit waiver. Plaintiffs state in their Opposition: "The structure and history of the State Treaty [STRIDA] indicate that Austria explicitly waived its immunity from suit." (Opposition at 17). Plaintiffs' own statement best illustrates the fallacy of their argument. If it is necessary to refer to the "structure and history" of STRIDA, then the waiver is not explicit. Explicit waivers may be ascertained simply by reading the document in which an explicit waiver is purportedly made. Here, upon examination of Article 26, the Court finds no explicit waiver of sovereign immunity.

■ To find an implicit waiver by virtue of a treaty, courts require "convincing evidence" that a treaty was intended to waive sovereign immunity. *See, e.g., Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 378 (7th Cir.1985); *see also Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 442–43, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("Nor do we see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States."). The legislative history reveals three examples of implicit waiver: (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a

foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity. *See Joseph v. Office of the Consulate General of Nigeria,* 830 F.2d 1018, 1022 (9th Cir.1987) (quoting *Frolova,* 761 F.2d at 377), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); H.R.Rep. No. 1487, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617. Considering this standard, the Court finds no implicit waiver of sovereign immunity.

■ Authority cited by Plaintiffs does not persuade the Court that Austria has implicitly waived sovereign immunity. In *Joseph,* 830 F.2d at 1023, the Ninth Circuit found an implicit waiver where a Nigerian consulate employee entered into a lease agreement containing a forum-selection clause specifying that disputes were to be resolved by United States courts. No analogous facts are present here, as STRIDA did not specify that disputes arising under the Treaty were to be resolved by United States courts.

The waiver exception to sovereign immunity does not apply.

**B. Commercial Activity Exception**

The commercial activity exception to sovereign immunity provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (2)[1] in which the action is

---

property, rights and interests remain heirless or unclaimed for six months after the coming into force of the present Treaty, or where in the case of organizations and communities such organizations or communities have ceased to exist. Austria shall transfer such property, rights and interests to appropriate agencies or organizations to be designated by the Four Heads of Mission in Vienna by agreement with the Austrian Government to be used for the relief and rehabilitation of victims of persecution by

the Axis Powers, it being understood that these provisions do not require Austria to make payments in foreign exchange or other transfers to foreign countries which would constitute a burden on the Austrian economy. Such transfer shall be effected within eighteen months from the coming into force of the present Treaty and shall include property, rights and interests required to be restored under paragraph 1 of this Article.

6 UST 2369, 1955 WL 44063 (U.S. Treaty).

based upon a commercial activity carried on in the United States by the foreign state; or [2] [in an action which is based] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] [in an action which is based] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . .

28 U.S.C. § 1605(a)(2).

### 1. Commercial Activity

■ "Commercial activity" is defined by the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "The commercial character of an activity [is] determined by reference to the nature of the course of conduct of a particular transaction or act, rather than by reference to its purpose." *Id.* "[W]hen a foreign government acts . . . in a manner of a private player within [the market], the foreign sovereign's acts are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (holding that the issuance of bonds by the Republic of Argentina was a "commercial activity" within the meaning of the FSIA).

■ In determining whether a sovereign's acts are commercial, the focus of the inquiry is not whether the sovereign acts with a profit motive; "[r]ather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id.* (citations and internal quotation marks omitted; emphasis in the original). Therefore, while a sovereign's issuance of regulations limiting foreign currency exchange is a sovereign activity (because a private party could not

ever exercise this authority), a contract by a sovereign to buy army boots or weapons is a commercial activity (because private companies can contract to acquire goods). *Id.*

Defendants Austria, Dorotheum, and ÖIAG argue that Plaintiffs do not allege that they have engaged in commercial activities. The Court agrees, in part. The allegations set forth in the FAC focus on the taking of property by a government through the imposition of discriminatory laws and taxes. The Plaintiffs describe horrendous abuse, but that abuse is of a distinctly governmental nature. Case law does not favor Plaintiffs on this issue. The United States Supreme Court has held that an abuse of police power does not constitute a commercial activity. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 358–63, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (holding that the arrest, torture, and imprisonment of a purported whistleblower constituted an abuse of police power rather than a commercial activity). Other courts have held that governmental expropriation of private property is not commercial activity. *See Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F.Supp.2d 947 (N.D.Ill.1999), *aff'd*, 215 F.3d 727 (7th Cir. 2000) ("It is obvious that government expropriation of private property under governmental authority—whether legitimate or illegitimate—is the classic type of [sovereign activity]"), *cert. denied*, 531 U.S. 1014, 121 S.Ct. 573, 148 L.Ed.2d 490 (2000); *Magnus Electronics, Inc. v. Royal Bank of Canada*, 620 F.Supp. 387, 390 (N.D.Ill.1985) (seizure of goods by Argentine Air Force was a sovereign activity rather than a commercial activity). Still other cases have held that the failure to pay war reparations as required by a treaty does not constitute a commercial activity. *See Wolf v. Federal Republic of Germany*, 95 F.3d 536, 543–44 (7th Cir.1996), *cert. denied*, 520 U.S. 1106, 117 S.Ct. 1112,

137 L.Ed.2d 313 (1997); *Sampson v. Federal Republic of Germany,* 975 F.Supp. 1108, 1116–17 (N.D.Ill.1997), *aff'd,* 250 F.3d 1145 (7th Cir.2001); *Hirsh v. State of Israel,* 962 F.Supp. 377, 382–83 (S.D.N.Y. 1997), *aff'd without published opinion,* 133 F.3d 907 (2d Cir.1997), *cert. denied sub nom., Berkowitz v. State of Israel,* 523 U.S. 1062, 118 S.Ct. 1392, 140 L.Ed.2d 651 (1998).

■ However, Plaintiffs have sufficiently alleged a claim against Austria under the first clause of the commercial activities exception by alleging that Austria acquired stocks and bonds of American companies during the relevant time period and either transferred ownership of those stocks and bonds (to itself) or exchanged the stocks and bonds for other property. Accordingly, Plaintiffs have stated a narrow claim against Austria based on the allegations described above.

### 2. "Direct Effect"

■ Plaintiffs claims are not appropriate under the third clause for another reason as well. Plaintiffs have alleged no "direct effect" in the United States.

The United States Supreme Court has described a "direct effect" within the meaning of the third clause of § 1605(a)(2) as "an effect [that is] as an immediate consequence of the defendant's ... activity." *Republic of Argentina v. Weltover,* 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citation omitted).

The District of Columbia Circuit has described a direct effect as "one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1172 (D.C.Cir. 1994), *cert. denied,* 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995). In *Princz,* the plaintiff alleged that he was forced to work in a German aircraft factory during the Nazi era. The plaintiff argued that

because the aircraft had a prominent role in the German war efforts against the United States, the activities had a direct effect on the United States. The court disagreed, holding that there were many events and actors who necessarily intervened between the work performed by the plaintiff and the effect that was felt in the United States.

Similarly, in *Antares Aircraft L.P. v. Federal Republic of Nigeria,* 999 F.2d 33, 36 (2d Cir.1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994), the Second Circuit held there was no direct effect on the United States based on the seizure of an aircraft by Nigerian officials. The Court stated that all the "legally significant acts took place in Nigeria," and found it irrelevant that proceeds from a New York bank account had been used to pay fees in connection with the negotiations for the return of the aircraft. *Id.; see also Australian Government Aircraft Factories v. Lynne,* 743 F.2d 672, 674–75 (9th Cir.1984) (pilot's death and loss of aircraft in crash in Indonesia had no direct effect on the United States), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985); *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 331–32 (9th Cir. 1984) (the economic effect on the survivors of American citizen killed by revolutionary group in Iran was not a direct effect on the United States), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984).

Defendants also cite cases that hold a plaintiff's continued suffering in the United States as a result of injuries incurred in a foreign land does not constitute a direct effect on the United States. *See Princz,* 26 F.3d at 1172; *Martin v. Republic of South Africa,* 836 F.2d 91, 95 (2d Cir. 1987); *Tucker v. Whitaker Travel Ltd.,* 620 F.Supp. 578, 586 (E.D.Pa.1985), *aff'd without published opinion,* 800 F.2d 1140 (3d

Cir.1986), *cert. denied*, 479 U.S. 986, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986).

Plaintiffs argue that Defendants have acquired wealth as a result of the property at issue in this action, and that such wealth advances Defendants' commercial interests in the United States. Even assuming this is true, it does not meet the standard for "direct effect" as described above.

Plaintiffs also argue that the Dorotheum (and therefore ÖIAG) engaged in commercial activities by transferring property to the United States and that these acts constitute commercial activity that has a direct effect on the United States. Defendants point out that allegations of such activities are not found in the FAC. The Court does not decide whether Plaintiffs could amend the FAC to sufficiently allege a claim under the commercial activity exception because such an amendment would be futile in light of the Court's dismissal based on the political question doctrine, as set forth in the in Section V, *infra*.

## C. Expropriation Exception

Plaintiffs claim that the "expropriation exception" to the FSIA applies. *See* 28 U.S.C. § 1605(a)(3). That exception provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... (3)[1] in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is en-

gaged in a commercial activity in the United States . . . .

*Id.*

### 1. Austrian Liability for Property Expropriated by the Nazis

Defendants make three arguments why the expropriation exception does not apply. First, Defendants argue that, even assuming an expropriation occurred, it is not responsible for it. Defendants contend that Austria cannot be held responsible for governmental acts during the Nazi era because Austria itself was a victim of Nazi aggression and occupation, without power to act. There is competing evidence on this point. On the one hand, Plaintiffs present evidence that in March 1938 Austria welcomed Hitler's invading force with open arms. (*See generally* Wippman Declaration). On the other hand, Defendants point to a statement of the Allied Powers, the Moscow Declaration of November 1, 1943, which proclaimed that the United Kingdom, the Soviet Union, and the United States considered Austria to be "the first free country to fall a victim to Hitlerite aggression." (*See* Moscow Declaration, *quoted in* Hafner Declaration at ¶ 10). The Court need not resolve this dispute at this time.[3]

■ At the jurisdictional stage, a Court need only determine that the plaintiff's claims are substantial and nonfrivolous in order to find that the plaintiff has established a sufficient basis for the exercise of the court's jurisdiction. *Siderman de Blake v. Republic of Argentina*, 965 F.2d at 711.

■ Additionally, as this Court explained in *Altmann*, the foreign state against whom a claim is made need not be the sovereign that expropriated the prop-

**3.** Indeed, this dispute is not particularly amenable to judicial resolution, and perhaps illustrates another reason why this action raises nonjusticiable political questions.

erty at issue. *See* 28 U.S.C. § 1605(a)(3) (excepting claims regarding property "taken in violation of international law" rather than excepting claims against foreign states that have taken property in violation of international law); *Altmann,* 142 F.Supp.2d at 1202.

### 2. The First Clause of the Expropriation Exception

 Second, the Defendants argue that Plaintiffs have not alleged that the property at issue is present in the United States (or property exchanged for that property). Therefore, Defendants argue, the first clause of § 1605(a)(3) does not apply. Plaintiffs argue that Austria expropriated Plaintiffs' property, and then exchanged this property for cash, foreign currency, and securities in United States Corporations and financial institutions. In so doing, Plaintiffs argue, Austria transferred Plaintiffs' property to the United States and conducted commercial activities in the United States. Additionally, Plaintiffs argue, many items of Plaintiffs' property consisted of securities issued by American business and institutions. These securities were converted to the use and benefit of Austria. *See* FAC ¶¶ 15, 52–361, 11, 20, 435–443. In Reply, the Defendants correctly argue that even assuming this is true, Plaintiffs have not alleged that the property is in the United States in connection with a commercial activity carried on here. Absent such allegations, Plaintiffs may not maintain a claim under the first clause of the expropriation exception.

### 3. The Second Clause of the Expropriation Exception

Finally, Defendants argue that the FAC fails to identify any property taken from Plaintiffs (or property exchanged for that property) that is owned or operated by Austria or its agencies or instrumentalities. Therefore, Defendants argue, the second clause of § 1605(a)(3) does not apply. Plaintiffs argue that they have alleged that the Dorotheum owns or operates property at issue in this action. *See* FAC ¶¶ 4–11, 13–14, 143, 154–55, 165, 306–07, 321, 363, 440–43.

 The second clause of the expropriation exception has two requirements: 1) the foreign state (or agency or instrumentality) own or operates the property at issue (or owns or operates property exchanged for such property), and 2) that the foreign state (or agency or instrumentality) engages in commercial activity in the United States.

 Plaintiffs have not explicitly argued that Austria owns or operates property at issue; rather, Plaintiffs argue that they have alleged that Dorotheum owns or operates the property at issue.[4] Plaintiffs have alleged that this action is one that seeks to "recover property stolen … by Defendants" and that Defendants have refused to return property to Plaintiffs. (FAC ¶ 20). These allegations imply that the Defendants are in possession of this property, but the detailed factual allegations do not so state. Plaintiffs cite a number of examples in the FAC of allegations that satisfy the "own or operate" requirement. However, examination of

4. Plaintiffs' counsel at oral argument successfully convinced the Court that under these circumstances, the Court has jurisdiction over Austria based on the actions of Dorotheum. *See Altmann v. Republic of Austria,* 142 F.Supp.2d 1187, 1205 (C.D.Cal.2001) (holding that Austria would not be immune under the expropriation exception where the plaintiff alleged that its agency or instrumentality owned or operated property taken in violation of international law and where agency or instrumentality engaged in commercial activity in the United States), *aff'd* 317 F.3d 954, 968 (2002).

those cited passages reveals only that one Plaintiff has alleged that property taken from his father and grandfather was given to the Dorotheum (FAC ¶¶ 154, 155), and a number of other Plaintiffs allege that the property at issue was appraised by Dorotheum.[5] (FAC ¶¶ 143, 165, 306, 307, 321).

Plaintiffs have alleged that Dorotheum engages in commercial activity in the United States. (FAC ¶ 13).

Except as to Plaintiff Kauders, who alleges that the property at issue was given to the Dorotheum, Plaintiffs have not satisfied the requirements of the second clause of the expropriation exception.

### D. Ruling Regarding Subject–Matter Jurisdiction Pursuant to the FSIA

There has been no waiver by Defendants within the meaning of 28 U.S.C. § 1605(a)(1).

Plaintiffs have stated a claim against Austria under the first clause of 28 U.S.C. § 1605(a)(2) based on the allegations that Austria took action in the United States with respect to stolen stocks and bonds.

Plaintiff Kauders has stated a claim against Dorotheum pursuant to 28 U.S.C. § 1605(a)(3).

### V. The Political Question Doctrine and the Austrian Governmental Defendants

Defendants argue that Plaintiffs' claims against the Austrian Governmental Defendants are nonjusticiable under the political question doctrine. Reluctantly, this Court agrees.

### A. The United States Need Not Raise the Political Question Doctrine Issue

Plaintiffs argue that the Government must raise the issue of the political question doctrine before the Court can address it. The Government, for its part, has "expressly not taken a position on whether [Plaintiffs'] claims are barred by the political question doctrine." [6] (02/24/03 Tr. at 32). Plaintiffs rely on *United States v. Reynolds,* 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Neither of these cases support Plaintiffs' position.

In *Reynolds,* the Supreme Court noted that "[t]he privilege [protecting military and state secrets] belongs to the Government, and must be asserted by it; it can neither be waived or claimed by a private party." *See Reynolds,* 345 U.S. at 7, 73 S.Ct. 528. *Winstar* involved a defense involving contracts that is particularly governmental in nature: the sovereign acts defense. *See Winstar,* 518 U.S. at 891, 116 S.Ct. 2432. The political question doctrine, however, is neither a defense nor a privilege, but a constitutional limitation on the power of the courts to adjudicate issues that are allocated to the political branches of government. The Court holds that the United States need not raise the issue of the political question doctrine before the Court can consider it.

### B. The Political Question Doctrine, Generally

The political question doctrine is a justiciability limitation with prudential

---

**5.** At oral argument, Plaintiffs' counsel suggested that these Plaintiffs' claims could be amended to state that the appraised items were taken by or somehow transferred to Dorotheum. In light of the Court's holding regarding the political question doctrine, such an amendment would be futile.

**6.** This statement is somewhat at odds with the Government's stated position that it urges "dismissal on any legal ground." (02/24/03 Tr. at 35). Nevertheless, the Court recognizes that the gentle art of diplomacy may well require such seemingly inconsistent positions.

roots dating back to *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 165–66, 2 L.Ed. 60 (1803) ("By the constitution of the United States, the President is invested with certain important political powers .... The subjects are political[,] ... and being entrusted to the executive, the decision of the executive is conclusive."). *See also Atlee v. Laird*, 347 F.Supp. 689, 692–700 (E.D.Pa.1972), *aff'd sub. nom. Atlee v. Richardson*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973) (tracing the evolution of the political question doctrine); *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers"). The doctrine holds that, "a federal court having jurisdiction over a dispute should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government." *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 483–84 (D.N.J.1999) (citing *Baker*, 369 U.S. at 210, 82 S.Ct. 691).

The Supreme Court has identified six factors to be addressed when determining whether a matter raises a nonjusticiable political question:

[1] A textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691. The court should dismiss a case as presenting a nonjusticiable political question if any one of the these factors is "inextricable from the case." *Alperin v. Vatican Bank*, 242 F.Supp.2d 686, 689 (N.D.Cal. 2003) (citing *Baker*, 369 U.S. at 217, 82 S.Ct. 691).

■ It has long been established that "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and the legislative—'the political'—departments of the government ...." *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Atlee*, 347 F.Supp. at 697 ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative." (citing *C. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948))); *Alperin*, 242 F.Supp.2d at 690 ("[W]hen foreign relations of the United States are at stake, courts properly are more hesitant to intervene than when internal operations of this country are involved."); *Iwanowa*, 67 F.Supp.2d at 484 ("The political question doctrine distinguishes between cases encompassing foreign relations and those addressing purely domestic issues." (citing *United States v. Curtiss–Wright Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936))). Courts have consistently found such cases to present nonjusticiable political questions for the following reasons: (1) the potentially relevant materials in a foreign policy case will likely come from a multitude of sources—both U.S. and foreign—that might be unmanageable for individual courts to handle due to the sheer bulk alone; (2) there is a very real possibility that the parties might not be able to compile all the relevant data, thus making any adjudication of the case both difficult and imprudent; (3) courts are inherently un-

able to predict international consequences flowing from a decision on the merits; (4) there might not be any standards for courts to apply in reaching a judgment on the merits; and (5) addressing questions of foreign policy requires courts to review initial determinations made by and constitutionally committed to the political branches of government. *See Iwanowa*, 67 F.Supp.2d at 484 (citing *Atlee*, 347 F.Supp. at 702–03); *Alperin*, at 690.

Nonetheless, not every case or controversy that touches upon foreign relations is beyond the realm of judicial cognizance. *Alperin*, 2003 WL 220434, at *4 (citing *Baker*, 369 U.S. at 211, 82 S.Ct. 691). "Rather, courts should undertake a 'discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, its susceptibility to judicial handling in the light of its nature and posture in the specific case, and the possible consequences of judicial action.' " *Id.* Because a discriminating analysis of Plaintiffs' claims reveals that they are inextricable from at least four of the *Baker* factors, they must be dismissed.

### 1. Constitutional Commitment of the Issue to Coordinate Political Branch

"The question ... is whether plaintiffs' claims are the type of claims that have been committed to the political branches for resolution." *Alperin*, at 690. To find that the claims at issue have not been committed to the political branches for resolution "would be to conclude that [the] claims are somehow distinct from every other type of claim arising out of World War II and that they have somehow been left open for judicial resolution." *Id.* (citing *In re Nazi Era Cases Against German Defendants Litigation*, 129 F.Supp.2d 370, 378 (D.N.J.2001)).

Here, Plaintiffs are seeking judicial review of treaties or agreements involving war reparations arising from the World War II era and are seeking to redress the Nazi confiscation of Plaintiffs' property. However, since 1945 the U.S. has been a party to numerous treaties and agreements, including the recent 2001 General Settlement Fund ("GSF"),[7] addressing World War II reparations.[8] This diplo-

---

7. The GSF is the result of an Executive Agreement between the United States and Austria ("2001 Executive Agreement"), providing for a forum to address remaining claims against Austria and Austrian companies arising out of the World War II era. *See generally* Statement of Interest of the United States of America, Anderman v. Federal Republic of Austria, CV 01–01769 FMC (AIJx) (*filed* October 19, 2001) (No. 76) (detailing diplomatic efforts). A copy of the Executive Agreement is attached thereto as Exh. 1–B.

8. The mere existence of a treaty does not necessarily make a claim a nonjusticiable political question. *Deutsch v. Turner Corp.*, 324 F.3d 692, 713 n. 11 (9th Cir.2003) (on rehearing) (disagreeing with the district court's conclusion that Deutsch's claim raised a political question due to the existence of several United States treaties and agreements resolving the war against Germany, but holding that the

California statute creating a reparations cause of action for World War II slave labor exceeded California's power to engage in foreign affairs for federalism purposes). Nevertheless, various courts have found the United States' course of diplomatic relations in the half century since World War II sufficient to commit this area to the political branches. *See e.g., Ungaro–Benages v. Dresdner Bank AG*, No. 01–2547–Civ–Hodges/Jones, slip op. at 19 (S.D.Fla.Feb.14, 2003) (concluding that the court must dismiss Plaintiff's claims, attempting to recover for property and moneys taken during World War II, under the political question doctrine) (copy attached as Exhibit A to the addendum to the Defendants Supp. Brief, filed Fed. 20, 2003); *Alperin*, at 689 (holding that the very magnitude of the horrors giving rise to Plaintiffs' World War II related claims placed those claims beyond the justiciable reach of the courts due to the political question doctrine); *In re Nazi Era Cases*, 129 F.Supp.2d at 388–89 (finding that the

matic history reflects a "firmly-established policy" that war reparations claims arising out of World War II fall within the domain of the political branches and are not subject to judicial review. *Iwanowa,* 67 F.Supp.2d at 484–86 ("[T]he most appropriate case for applicability of the political question doctrine concerns the conduct of foreign affairs.") (citing *Baker,* 369 U.S. at 211, 82 S.Ct. 691). For these reasons, the Court finds that Plaintiffs' claims are of the type that have been constitutionally committed to the political branches of government.

## 2. Lack of Judicially Discoverable and Manageable Standards

For over thirty years, courts have repeatedly found claims such as those presented by Plaintiffs to be within the province of the political branches due in large part to the judiciary's lack of discoverable and manageable standards that are necessary to adjudicate such actions. *See, e.g., Kelberine v. Societe Internationale,* 363 F.2d 989 (D.C.Cir.1966), *cert. denied,* 385 U.S. 989, 87 S.Ct. 595, 17 L.Ed.2d 450 (1966) (dismissing a forced labor class action against a Swiss holding company based on the court's inability to adjudicate the case without guidance, authorization, or support from the legislative or executive branches); *Iwanowa,* 67 F.Supp.2d at 489 (dismissing similar forced labor claims, noting that "[t]he specter of adjudicating thousands of claims arising out of a war that took place more than fifty years ago amounts to a more daunting task for [the New Jersey District Court] to tackle than the *Kelberine* Court could have ever contemplated"); *Burger–Fischer v. DeGussa*

*AG,* 65 F.Supp.2d 248, 284 (D.N.J.1999) (noting a lack of judicial standards to adjudicate slave labor claims against private German corporations regarding the inadequacy of German reparations, and asking "[b]y what conceivable standard could a single court arrive at a fair allocation of resources among all the deserving groups ... [and] acquire the information needed to fashion such a standard?"); *Alperin,* at 693–94 (finding insurmountable barriers to adjudicating plaintiffs' claims for monetary war reparations from a religious order). *But see Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000) (deciding the merits—in the absence of a political question challenge by defendants—of a class action brought by descendants of Jewish customers of French banking institutions to recover specific sums of money and deposited assets that were expropriated and retained by defendant banks).

In cases such as this, courts have generally found this second *Baker* factor to be present for the following reasons: (1) there are thousands of potential plaintiffs worldwide that must be identified and notified; (2) the existence of several treaties between the governments of defendants and each potential plaintiff that must be analyzed to determine whether they have subsumed individual claims or whether individual remedies have already been provided for; (3) relevant materials come from a multitude of sources-often in foreign languages-that are both voluminous and potentially unmanageable by individual courts; (4) when sources are scattered around the world, parties are unlikely to be able to gather all of the pertinent data;

Executive branch has committed to resolving World War II related claims on an intergovernmental level based on almost six decades of treaties and agreements addressing this issue); *Burger–Fischer v. DeGussa AG,* 65 F.Supp.2d 248, 282 (D.N.J.1999) (declining to adjudicate forced labor claims against Ger-

man corporations on political question grounds due to the diplomatic history of attempts at resolving Holocaust-related claims); *Iwanowa,* 67 F.Supp.2d at 483 (dismissing forced labor claims arising out of World War II as presenting a nonjusticiable political question).

(5) potential plaintiffs who are elderly may raise unique challenges, particularly given their locations around the world. *See Iwanowa*, 67 F.Supp.2d at 489 (adopting the reasoning of *Kelberine*, 363 F.2d at 995; *Atlee*, 347 F.Supp. at 702). In short, "[w]ithout guidance from the political branches of government, the courts are unable to manage and resolve [war reparations] claims arising out of actions that took place over fifty years ago, in a foreign nation, during wartime." *See Iwanowa*, 67 F.Supp.2d at 489, and 485 n. 84 (finding that forced labor claims for restitution are in effect claims for reparations); *Alperin*, at 694 (extending the reasoning of *Kelberine*, *Iwanowa*, and *Burger–Fischer* in the context of slave labor claims to war reparations claims arising out of the same Nazi era). Because each of these factors is present here, Plaintiffs claims against the Austrian Governmental Defendants present issues the resolution of which this Court lacks judicially discoverable and manageable standards.

### 3. Lack of Respect Due Coordinate Political Branches

"The executive branch has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations." *Iwanowa*, 67 F.Supp.2d at 486. As such, "allowing private litigation of war-related crimes would express a lack of respect for the executive branch." *Id.* Allowing Plaintiffs to seek reparations for wrongs committed out of World War II related crimes through private litigation would clearly express a lack of respect for the political branches and their attempted resolution of such claims with the GSF. Although Plaintiffs contest the adequacy of relief provided by the GSF, "the questions whether the reparation agreements made adequate provision for the victims of Nazi oppression and whether [those agreements have been] adequately implemented ... are po-

litical questions which a court must decline to determine." *Burger–Fischer*, 65 F.Supp.2d at 282, 284 (concluding that for a court to restructure a reparations scheme, in light of diplomatic history of the last fifty years, would be to express the ultimate lack of respect for both the executive branch, as the negotiator, and the Senate, as the ratifier of the various treaties emanating those negotiations).

### 4. Potential Embarrassment from Multifarious Pronouncements by Various Branches

Due to the fact that the Executive has negotiated for and agreed to the GSF, coupled with the aforementioned reasons, this Court's resolution of Plaintiffs' claims has the potential to embarrass and undermine the Executive's authority in foreign affairs. *See, e.g., Iwanowa*, 67 F.Supp.2d at 487–88.

### C. Plaintiffs' Arguments

Plaintiffs argue that this case does not present a political question because this case involves a determination of the scope of executive power. *See, e.g., D.K.T. Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236, 1238 (D.C.Cir.1987) (finding no political question was presented where organizations brought suit challenging lawfulness of the implementation of a policy prohibiting United States funds being given to foreign nongovernmental organizations that perform or actively promote abortion where the Plaintiffs challenged the legality of the policy rather than the policy's political and social wisdom).

Plaintiffs contend that the Executive Branch did not have the power to enter into the 2001 Executive Agreement because the Agreement impermissibly attempts to extinguish rights granted to victims of Nazi-era atrocities by STRIDA. Plaintiffs rely on, *inter alia, United States*

*v. Capps,* 204 F.2d 655, 658 (4th Cir.1953), *aff'd on other grounds,* 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955), which held that an executive agreement was unenforceable because it contravened a federal statute dealing with the same issue.

Similarly, Plaintiffs argue that Defendants have violated Article 40 of the Vienna Convention, May 23, 1969, 1155 U.N.T.S. 331, which requires all parties to the treaty be given an opportunity to participate in negotiations regarding any amendments to that treaty. Plaintiffs point out that only the United States and Austria were parties to the Executive Agreement, and that the other nations that are party to STRIDA did not. Because the other nations were not given the opportunity to participate, Plaintiffs argue, the Executive Branch has exceeded its power to act.

 Plaintiffs' arguments are unpersuasive. The executive branch may enter into binding international agreements through executive agreements that do not require the consent of the Senate. *See Weinberger v. Rossi,* 456 U.S. 25, 30 n. 6, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982). The Executive Agreement explicitly preserves STRIDA.[9] Moreover, the Government's negotiator, Stuart E. Eizenstat, former Special Representative of the President and the Secretary of State on Holocaust Issues, has submitted a declaration that states that the Executive Agreement "is not a government-to-government claims settlement agreement, and the United States has not extinguished the claims of its nationals or anyone else." *Id.*

At oral argument, Plaintiffs' counsel for the first time raised an argument based on *Dames & Moore v. Regan,* 453 U.S. 654, 668–69, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). In *Dames & Moore,* the Supreme Court articulated three levels of executive power, which vary in correlation with the degree of the Executive's concordance with Congressional will. The Supreme Court explained that when the Chief Executive acts pursuant to the express or implied authorization of Congress, he acts with the full power of both the executive and legislative branches; therefore, his power is at its greatest ebb. When the Chief Executive acts in the absence of Congressional authorization, he enters "a zone of twilight," in which he and Congress may have concurrent authority, or in which the distribution of power may be uncertain. At this mid-level, the Court states that the validity of the Executive's power turns on a consideration of all the circumstances that may shed light on the views of Congress toward such action. At the third level, the Executive's power is at its lowest ebb when he acts in contravention of the will of Congress.

Plaintiffs' counsel suggested that with respect to the 2001 Executive Agreement, the Executive acted in an area between the second and third *Dames & Moore* levels; Defendants' counsel disagreed, stating without elaboration that the Executive acted with Congressional approval.

The Court is persuaded that the Executive did not act in contravention to Congressional will. Despite Plaintiffs' counsel's repeated protestations to the contrary, as explained above, the 2001 Executive Agreement expressly preserves STRIDA. Counsel suggested that the Agreement is merely a "back door" attempt to extinguish Holocaust victims' claims through the operation of the polit-

---

**9.** The Agreement provides: "The Austrian Federal Government agrees that this exchange of notes and the establishment of the GSF shall not affect unilateral decisions or bilateral or multilateral agreements that dealt with the consequences of the National Socialist era or World War II." *See* Note Verbale, Jan. 23, 2001, Vienna, at 3 (attached as Exh. 1–B to the Government's Statement of interest).

ical question doctrine. Although not unsympathetic to this argument, the Court is not persuaded by it. The Court is not prepared to hold that the Agreement was intended to effectuate the very result that its language explicitly disclaims. Therefore, the Court cannot conclude that the Executive acted in contravention of Congressional will. The Court instead concludes that the Executive acted at least at the second *Dames & Moore* level, and that no authority suggests that Congress would have disapproved of the Executive Agreement. Accordingly, the Court does not find that the Executive branch acted outside its authority in entering into the 2001 Executive Agreement.

### D. Plaintiffs' Claims Against the Austrian Governmental Defendants Present a Nonjusticiable Political Question

■ Other courts have noted, and this Court agrees that "[i]f pure evil has ever existed, it was undeniably manifest in the conduct of the Nazi government ... during the 1930s and 1940s." *Ungaro–Benages,* No. 01–2547–Civ–Hodges/Jones, slip op. at 19 (quoting *In re Nazi Era Cases,* 129 F.Supp.2d at 389). This Court must refrain from adjudicating claims in this action arising out of that era, but not because those claims are undeserving of relief. "Every human instinct yearns to remediate in some way the immeasurable wrongs inflicted upon so many millions of people by [the Nazi regime] so many years ago ...." *Burger–Fischer,* 65 F.Supp.2d at 285. Nevertheless, "[t]his Court must

dismiss Plaintiff's claims because the magnitude of World War II has placed claims such as [these] beyond the province of this Court, and into the political realm." *Id.*

Accordingly, because Plaintiffs' claims against the Austrian Governmental Defendants are inextricable from four of the *Baker* factors, this Court is compelled to conclude that these claims present a nonjusticiable political question.

### VI. The Political Question Doctrine and the Insurance Defendants

■ Defendants also argue that the political question doctrine precludes this Court's exercise of jurisdiction over Plaintiffs' claims against the Insurance Defendants. In applying the *Baker* factors, the Court concludes that three of the factors compel dismissal of Plaintiffs' claims.

### A. Constitutional Commitment of the Issue to Coordinate Political Branch

As discussed in the previous section, the Constitution clearly commits foreign affairs power to the executive branch. The Executive Agreement establishes that the executive branch's position on the type of insurance claims presented in this case should be adjudicated within the claims procedure of the International Commission on Holocaust Era Insurance Claims ("ICHEIC") or the Austrian General Settlement Fund. The negotiations undertaken to provide for these claims are within the executive's foreign affairs power where, as here, the policies were issued by foreign companies in a foreign nation to foreign nationals.[10]

---

**10.** The Court recognizes that this first factor is more compelling with respect to the Austrian Governmental Defendants than it is with respect to the Insurance Defendants. Defendants cite a number of cases that they claim support the proposition that the President has the ability to enter into agreements that bar claims by United States citizens against for-

eign governments and foreign nationals. *See Weinberger v. Rossi,* 456 U.S. 25, 30 n. 6, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982); *Dames & Moore v. Regan,* 453 U.S. 654, 688, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *Ozanic v. United States,* 188 F.2d 228 (2d Cir.1951). Examination of these cases,

## B. Lack of Respect Due Coordinate Political Branches

Allowing Plaintiffs to pursue their claims would express a lack of respect for the political branches and their attempted resolution of such claims through the procedures outlined in the GSF.

## C. Potential Embarrassment from Multifarious Pronouncements by Various Branches

As noted in the previous section, the fact that the Executive has negotiated for and agreed to the GSF, this Court's resolution of Plaintiffs' claims would has the potential to embarrass and undermine the Executive's authority in foreign affairs.

## VII. Conclusion

Few claims cry out for justice more loudly than those advanced by victims of the Holocaust. The abuses suffered by Europe's Jews and other disfavored minorities were those of a totalitarian government. Our own system of government guards against such totalitarianism through a system of separation of powers allocated to a tripartite government. *See Iwanowa,* 67 F.Supp.2d at 483 ("The political question doctrine ... is based on pragmatic considerations, based on the separation of powers concept and our system of checks and balances."). Ironically, and regrettably, in complying with the our own nation's constitutional safeguards of separation of powers, this Court is unable to adjudicate the claims brought in this action.

The Court **hereby dismisses with prejudice** all claims as to all Defendants.

---

however, reveals discussions regarding the disposition of claims against foreign governments only. *But see Dames & Moore,* 453 U.S. at 662, 101 S.Ct. 2972 (unclear if Central Bank of Iran is government-controlled entity).

Nevertheless, courts have not hesitated to apply the political question doctrine based on the executive branch's foreign affairs power

to cases in which private entities are defendants. *See, e.g., In re Nazi Era Cases,* 129 F.Supp.2d 370 (defendants were a German company and its American subsidiaries); *Iwanowa,* 67 F.Supp.2d 424 (Ford Motor Co.); *Burger–Fischer,* 65 F.Supp.2d 248 (German corporations).